**Ipcia M. KERCADO–MELENDEZ, Plaintiff, Appellee,**

v.

**Awilda APONTE–ROQUE, etc., Defendant, Appellant.**

**No. 86–1853.**

United States Court of Appeals, First Circuit.

Heard May 7, 1987.

Decided Sept. 22, 1987.

Carlos Del Valle, with whom Hector Rivera Cruz, Secretary of Justice, Ramirez & Ramirez and Marcos A. Ramirez Irrizarry, Hato Rey, P.R., were on brief, for defendant, appellant.

Hector Gonzalez Lopez, with whom Hector Urgell Cuebas and Pedro Miranda Corrada, San Juan, P.R., were on brief, for plaintiff, appellee.

Before BOWNES and BREYER, Circuit Judges, and CAFFREY,* Senior District Judge.

BOWNES, Circuit Judge.

Defendant-appellant Awilda Aponte-Roque, Secretary of the Department of Public Instruction (DPI) in Puerto Rico, appeals a judgment entered against her in a section 1983 suit brought by plaintiff-appellee Ipcia M. Kercado-Melendez. Kercado had alleged that she was fired from her position as superintendent of the Dorado School District because of her political affiliation with the Partido Nuevo Progresista (PNP). The United States District Court for the District of Puerto Rico, sitting without a jury, ordered Kercado reinstated to her former position, and awarded her over $37,000

* Of the District of Massachusetts, sitting by designation.

in back pay and damages. This appeal by Aponte followed.

## I. BACKGROUND

Ipcia Kercado worked for the Department of Public Instruction for eighteen years, rising through the ranks until she attained the position of superintendent for the Dorado School District. Kercado was well known in Dorado as a prominent member of the Partido Nuevo Progresista, which was deposed as Puerto Rico's ruling party by the Partido Popular Democratico (PPD) in the election of 1984. In January, 1985, Awilda Aponte-Roque, a PPD member, was appointed Secretary of the DPI.

On October 28, 1985, Kercado received a complaint[1] from the Secretary of Public Instruction cancelling her teaching certificate and dismissing her as superintendent of the Dorado School District. It charged Kercado with incompetence, negligence, insubordination, and improper conduct. Kercado was accused of keeping two teachers in administrative positions during the month of August, 1985, when they should have begun to resume their teaching duties. It was also alleged that she improperly impeded the Dorado district's assistant superintendent, Hector Lopez Maldonado, from performing his duties. In addition, Kercado was charged with failing to process fourteen teacher assistant appointments.

The complaint informed Kercado that Aponte, in her capacity as Secretary of the DPI, had decided to "permanently cancel your teacher certificate(s) which you hold in order to teach in the public and private schools of the Commonwealth of Puerto Rico and [to] dismiss you from your post." The cancellation order which became effective upon receipt by Kercado stated that, pursuant to Puerto Rico law, she had ten days to appeal the order to the Board of Appeals of the Public Education System. Such an appeal would stay the effect of the cancellation order, substituting in its stead a suspension of Kercado's employment and salary pending the outcome of her appeal. The order further stated that if Kercado did not appeal the cancellation within ten days, it would become "final and binding."

On November 5, 1985, Kercado filed an appeal with the Board of Appeals, which scheduled a hearing on the charges for November 27. On November 7, Kercado instituted an action in the United States District Court for the District of Puerto Rico, claiming that her dismissal was prompted by her affiliation with the PNP. Kercado also asserted that she had been denied due process, because she had not been given an opportunity to respond to the charges against her prior to the Secretary's termination action. She sought either a temporary restraining order or a preliminary injunction. The following day, November 8, Kercado withdrew her appeal from the Board of Appeals.

After Kercado had filed her action in federal court, and withdrawn her administrative appeal, the Secretary invited her to appear at an informal hearing scheduled for November 14, 1985. Kercado wrote a letter to the Secretary in which she declined the invitation to appear at the informal hearing. In the letter, she noted that a "show cause" hearing was scheduled in federal court on November 18, which would address the issue of whether the failure to grant her a hearing before the issuance of the cancellation order violated her due process rights. On November 18, the Secretary dismissed all charges against Kercado and reinstated her as superintendent of the Dorado School District.

One week later, the Secretary tried again to dismiss Kercado. On November 25, Kercado received a letter requesting her presence at an informal hearing on charges against her. The hearing took place the following day, November 26, before Elba Rodriguez Fuentes, Director of the Legal Division at the DPI. Kercado was read the charges against her and given the opportunity to respond. No evidence or witnesses were presented by either side at the hearing.

On December 9, Kercado was served with an order cancelling her superintend-

---

**1.** The document is a combined notice and order   entitled "Complaint."

ent's certificate and dismissing her from employment with the DPI. The December 9 order enumerated the same charges contained in the October 28 order, albeit in a more condensed form. The order notified Kercado of her right to file an administrative appeal, and informed her that a failure to file such an appeal within ten days would render the order "final and binding."

Kercado declined to file an administrative appeal; instead, she pressed her action in the federal court. She amended her original complaint and sought injunctive relief and damages under 42 U.S.C. § 1983. The district court agreed with Kercado that she had been dismissed from her position as superintendent because of her political affiliation with the PNP. The court found the charges brought by the Secretary against Kercado to be without merit. It noted further that, even accepting the facial validity of the Secretary's allegations, they were not serious enough "to warrant the *discharge* of an employee of plaintiff's caliber who had been with the DPI for eighteen years." (Emphasis in original.) The court also held that Kercado had been deprived of her due process rights when the Secretary dismissed her on October 28, 1985, without granting her a pretermination hearing. Accordingly, the district court ordered the Secretary to reinstate Kercado as superintendent of the Dorado School District, 641 F.Supp. 1326. Kercado was awarded $12,074.50 in back pay, $15,-000 in actual damages and $10,000 in punitive damages.

## II. THE ISSUES

There are four issues on appeal. First, the Secretary urges that the district court should have abstained from hearing the case because Kercado could have pressed her claims in the state administrative appeal that was available to her. The Secretary points out that, had Kercado been dissatisfied with the result in the administrative proceeding, she could have appealed the decision to the commonwealth courts of Puerto Rico. Second, Aponte submits that the court erred in holding that Kercado's due process rights were violated, since she could have filed an administrative appeal and received a hearing before her termination became fully operative. Third, the Secretary also contends that the district court erred in finding that Kercado had been dismissed for political reasons. She argues that the charges brought against Kercado were substantive and legitimate grounds for dismissal. Fourth, it is argued that the district court erroneously granted Kercado compensatory and punitive damages. We consider each of these contentions seriatim.

### Abstention

■ The Secretary avers that the district court erred when it failed to dismiss the case in accordance with the doctrine established in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). The federal plaintiff in *Younger*, John Harris, Jr., was being prosecuted under a state criminal syndicalism statute. He asked a three-judge federal district court to enjoin state criminal proceedings instituted against him, alleging that his prosecution would immediately and irreparably injure his first amendment rights. The three-judge court held that the criminal syndicalism statute was void due to vagueness, and restrained the state from further prosecution of Harris. The Supreme Court reversed, holding that the district court should have abstained from hearing Harris' claim. The Court stated that considerations of federalism and comity dictated that a federal court should refrain from deciding broad constitutional challenges to the legitimacy of a state criminal proceeding, provided that the state proceeding was undertaken in good faith and the federal plaintiff was given an adequate opportunity to press his constitutional claims in the state forum. *Younger v. Harris*, 401 U.S. at 43–53, 91 S.Ct. at 751–55.

Since *Younger*, the Supreme Court has invoked the abstention doctrine to overturn federal court challenges to the constitutionality of pending state civil proceedings. *Penzoil Co. v. Texaco, Inc.*, — U.S. —, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987); *Middlesex Ethics Committee v. Garden State*

*Bar Association,* 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982); *Moore v. Sims,* 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979); *Trainor v. Hernandez,* 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977); *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977); *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975). Those cases featured federal plaintiffs who had lodged broad constitutional attacks on the legitimacy of state civil proceedings instituted against them. In each case, the federal court was asked to enjoin a contemporaneous state civil proceeding pending against the federal plaintiff; the relief sought by the federal plaintiff was directed specifically at the pending state proceeding. Here, Kercado had not requested the federal district court to enjoin any state civil proceeding pending against her. Such a prayer would have been futile because the Secretary had already completed dismissal proceedings against Kercado; by its own terms, the order of dismissal became effective upon its receipt by Kercado. Accordingly, there were no proceedings for the district court to enjoin.

The Secretary urges, however, that because Kercado could have appealed the dismissal to the DPI Board of Appeals, the district court should have abstained and thereby forced Kercado to litigate her constitutional claims in a Puerto Rico forum. In effect, the Secretary argues that Kercado should not have been permitted to bring a section 1983 suit in federal court because of the availability of an appeal within the Puerto Rico administrative and judicial apparatus. The Supreme Court, however, has held expressly that section 1983 claimants need not avail themselves of state judicial and administrative remedies before going to federal court. *Patsy v. Florida Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982); *Steffel v. Thompson,* 415 U.S. 452, 472–73, 94 S.Ct. 1209, 1222–23, 39 L.Ed.2d 505 (1974). The federal plaintiff in *Patsy* alleged that she had been denied employment opportunities

by Florida International University on the basis of race and sex. Rather than pursue available state administrative remedies, she chose to file a section 1983 claim in federal court. The Supreme Court rejected "the argument that a section 1983 action should be dismissed where the plaintiff has not exhausted state administrative remedies." *Patsy v. Florida Board of Regents,* 457 U.S. at 500, 102 S.Ct. at 2559.

The Secretary relies heavily on the Court's decision in *Ohio Civil Rights Commission v. Dayton Christian Schools,* 477 U.S. 619, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986), which held that the principles of *Younger* abstention apply to pending state administrative, as well as state judicial, proceedings. The Ohio Civil Rights Commission instituted a state administrative proceeding against Dayton Christian Schools, alleging that it had dismissed a teacher because of her sex and her efforts to assert her legal rights. Dayton responded by asserting that the first amendment prohibited the Commission from exercising authority because the dismissal of the teacher had been undertaken pursuant to internal guidelines grounded in sincerely held religious beliefs to which all of its employees subscribed. While the state administrative proceeding was pending, Dayton Christian Schools filed a section 1983 action in federal court claiming that the administrative proceeding instituted by the Ohio Civil Rights Commission violated its first amendment right to free exercise of religion.

The Supreme Court ruled that the interests of comity and federalism rendered abstention appropriate under such circumstances. It held that Ohio had an important interest in regulating schools, even private religious schools. The Court also noted that Dayton Christian Schools would have an opportunity to raise its constitutional claims in the state administrative proceeding. Justice Rehnquist, writing for the majority, stressed that the Court's decision in *Dayton Christian Schools* did not conflict with its earlier holding in *Patsy:* [2]

---

**2.** The *Patsy* holding was reaffirmed recently by the Court in *Wright v. Roanoke Redevelopment* *and Housing Authority,* —— U.S. ——, 107 S.Ct. 766, 773, 93 L.Ed.2d 781 (1987) ("the existence

The application of the *Younger* principle to pending state administrative proceedings is fully consistent with *Patsy v. Florida Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982), which holds that litigants need not exhaust their administrative remedies prior to bringing a § 1983 suit in federal court. *Cf. Huffman v. Pursue, Ltd.*, 420 U.S. 592, 607–11, 95 S.Ct. 1200, 1209–12, 43 L.Ed.2d 482 (1975). Unlike *Patsy*, the administrative proceedings here are coercive rather than remedial, began before any substantial advancement in the federal action took place, and involve an important state interest.

*Dayton Christian Schools*, 106 S.Ct. at 2723 n. 2.

The crucial distinction between *Dayton Christian Schools* and *Patsy* is that in *Patsy* the state proceeding was an option available to the federal plaintiff on her own initiative to redress a wrong inflicted by the state. In *Dayton Christian Schools* and the other abstention cases noted above, the federal plaintiffs sought to enjoin a pending state proceeding which they did not initiate, but in which their presence was mandatory. Here, unlike *Dayton Christian Schools*, the administrative proceeding is remedial rather than coercive. The administrative appeal process could be triggered only on Kercado's initiative if she wished to pursue her remedies within the

Puerto Rico administrative framework. *Patsy* holds that she was not required to do so.

There is another important difference between *Patsy* and the abstention cases. In *Dayton Christian Schools* and similar cases, the state proceeding is itself the wrong which the federal plaintiff seeks to correct via injunctive relief under section 1983. Those cases involved claims by plaintiffs that constitutional rights would be violated by virtue of the operation of the state proceedings. Comity and federalism concerns are at their highest in such cases since the legitimacy of both the state proceeding and its underlying statutory predicate are at stake. Abstention is appropriate in such instances because, absent bad faith or an adequate opportunity to raise the constitutional challenge in the state forum, state courts should have the first opportunity to construe the constitutionality of their own proceedings. "Minimal respect for the state processes, of course, precludes any presumption that the state courts will not safeguard federal constitutional rights." *Middlesex Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. at 431, 102 S.Ct. at 2521.

■ An inquiry into the appropriateness of abstention is warranted if the relief sought by the federal plaintiff is addressed directly to an ongoing state proceeding. *Moore v. Sims*, 442 U.S. at 431, 99 S.Ct. at 2381. In *Patsy* and cases like it,[3] absten-

of a state administrative remedy does not ordinarily foreclose resort to § 1983"). This circuit has on a number of occasions expressly reaffirmed the holding in *Patsy* that § 1983 plaintiffs need not exhaust state remedies prior to filing suit in federal court. *Exeter-West Greenwich Regional School District v. Pontarelli*, 788 F.2d 47, 52 (1st Cir.1986); *Urbanizadora Versalles, Inc. v. Rivera Rios*, 701 F.2d 993, 999 (1st Cir.1983); *Developmental Disabilities Advocacy v. Melton*, 689 F.2d 281, 286 n. 15 (1st Cir.1982).

3. *E.g., Praprotnik v. City of St. Louis*, 798 F.2d 1168, 1172–73 & n. 4 (8th Cir.1986) (district court was not required to abstain from case brought by a city employee who alleged he was laid off for exercising his first amendment rights; fact that federal plaintiff had initiated an appeal to the civil service commission did not

mandate abstention since he was not required to exhaust his state administrative remedies prior to filing the federal suit), *cert. granted, —— U.S. ——*, 107 S.Ct. 871, 93 L.Ed.2d 826 (1987); *Clark v. Yosemite Community College Dist.*, 785 F.2d 781, 790 (9th Cir.1986) (federal plaintiff who alleged his teaching duties were interfered with because of the exercise of his first amendment rights need not exhaust his state administrative remedies); *Stana v. School Dist. of City of Pittsburgh*, 775 F.2d 122, 129–30 (3d Cir.1985) (public school teacher denied employment opportunities need not exhaust state remedies); *Brantley v. Surles*, 718 F.2d 1354, 1358–60 (5th Cir.1983) (public school cafeteria worker discharged for exercising her constitutional rights need not exhaust state remedies).

tion was unnecessary because the federal plaintiffs did not allege injury arising from, or seek relief directed to, an ongoing state proceeding. Instead, the federal plaintiff claimed actual injury arising from action undertaken and completed by state actors. Thus, the state interest at stake was severely diminished because the federal plaintiffs were not seeking to mount a broad, constitutional attack on the legitimacy of the state proceedings or their underlying statutory predicate.

The dissent asserts that we can conclude that there is no challenge to an ongoing state proceeding only by "artificially separating" the "notice" which Kercado received on December 9 from the administrative remedy which was available to her. We note first that the document which Kercado received on December 9 was not simply a "notice," but was also an *order* cancelling her teacher's certificate and dismissing her from employment. The dissent's assertion that the dismissal order would take "effect only *after* the Board of Appeals of the Public Education System holds a full public hearing on the record" is flatly contradicted by the language of the order itself. It states: "The present Order shall become effective upon notification and receipt of the same by the accused." The issuance of the dismissal *order*, based on an unconstitutional motive, constituted the legal wrong suffered by Kercado. Kercado's rights were triggered at the moment the allegedly wrongful dismissal became effective. We have made no "artificial" separation here; we have simply separated the alleged wrong inflicted upon Kercado from the remedies available to her.

The dissent errs by suggesting that there must be a hearing by the Board of Appeals before the dismissal order becomes final and binding; there is no such requirement. P.R.Laws Ann. tit. 18, § 274b. Review by the Board of Appeals is couched, by the language of the statute itself, as a remedy available to a teacher who is dissatisfied with a dismissal order: "If not satisfied with the order, the teacher

thereby aggrieved *may* file a writ of appeal with the Board of Appeals...." P.R. Laws Ann. tit. 18, § 274c (emphasis added). The dissent's description of the administrative appeal scheme omits a crucial fact: the dismissed teacher must take affirmative steps to initiate the appeal to the Board of Appeals. She cannot be coerced into appearing before the Board of Appeals, but is provided with an administrative remedy should she choose to avail herself of it. Undoubtedly, the administrative appeal scheme here is perfectly adequate for handling the vast majority of teacher dismissals, which ordinarily do not involve federal constitutional claims. But a teacher who alleges that her dismissal was motivated by an unconstitutional purpose need not pursue her administrative remedies within the Commonwealth system, but may proceed directly to federal court to press her claims. This is precisely the holding of *Patsy*.

Despite the Court's clear holding in *Patsy*, the dissent contends that the District Court of Puerto Rico should not have heard her claim until she had pursued her administrative remedy. This fails to recognize that there is a significant difference between a civil rights plaintiff who seeks to use the federal courts to stop or nullify an ongoing state proceeding in which she is a defendant, and a civil rights plaintiff who has an option to initiate a state proceeding to remedy a constitutional wrong perpetrated by a state actor. In the former case, abstention is appropriate; in the latter, the *Patsy* rule prevails.

The dissent notes that the Court in *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), stated that "a necessary concomitant of *Younger* is that a party ... must exhaust his state appellate remedies before seeking relief in the District Court." Subsequently, the Court restricted the reach of this language, noting specifically that it applies only when a federal plaintiff seeks to avoid state judicial appeals and, instead, use the federal courts

"to annul the results of a state trial." *Wooley v. Maynard*, 430 U.S. 705, 710–11, 97 S.Ct. 1428, 1433, 51 L.Ed.2d 752 (1977). Here, of course, the federal plaintiff has made no such effort. Both *Huffman* and *Pennzoil v. Texaco*, — U.S. —, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987), also cited by the dissent, hold that federal plaintiffs aggrieved by the results of a state trial must pursue their state judicial appeals before going to federal court. The instant case, like *Patsy*, involves a federal plaintiff aggrieved by an allegedly unconstitutional deprivation of employment by state officials. The Court has imposed no requirement that she pursue her administrative remedies in such circumstances.[4]

We believe that this matter is controlled by the principles outlined in *Patsy*. The instant case is not an appropriate occasion for abstention. The thrust of Kercado's claim challenges the basis of the dismissal action undertaken and completed by the Secretary. Kercado could have sought to remedy this allegedly wrongful act in a state administrative proceeding, but was not required by law to do so. She also claimed that the Secretary deprived her of due process by not granting her a pretermination hearing prior to issuing the letter of dismissal. Such a claim does not implicate abstention concerns since it does not constitute a challenge to a pending state proceeding. The Secretary had completed her action against Kercado who, in turn, alleged that the substance and the procedural effectuation of that completed action violated the Constitution. Because Kercado's claim did not involve a challenge to the

4. The other lower court cases cited by the dissent are inapposite. They involve challenges by federal plaintiffs to ongoing coercive state proceedings initiated against them. The relief sought in those cases runs directly against the proceedings themselves. We have already noted that abstention is entirely appropriate in such circumstances. Such circumstances do not, however, prevail here.

5. The Secretary does not argue that by reinstating Kercado on November 18, 1985, the injury caused by the alleged deprivation on October 28 was somehow cured or rendered moot. Kerca-

legitimacy of a pending state proceeding, we reject the Secretary's contention that the lower court should have abstained.

### Procedural Due Process

The Secretary disputes the district court's conclusion that Kercado's due process rights were violated when she was deprived of a pretermination hearing prior to receiving the dismissal order of October 28, 1985. Kercado's due process claim depends on her having had a property interest in her employment.[5] *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985); *Board of Regents v. Roth*, 408 U.S. 564, 576–78, 92 S.Ct. 2701, 2708–10, 33 L.Ed.2d 548 (1972). Property interests are not created by the Constitution, but are rooted in an independent source such as state law. *Cleveland Board of Education v. Loudermill*, 470 U.S. at 538, 105 S.Ct. at 1491. *Board of Regents v. Roth*, 408 U.S. at 577, 92 S.Ct. at 2708–10. The Secretary admits that a school superintendent is a career employee under Puerto Rico law. 3 L.P.R.A. §§ 1349–52 (1978). Puerto Rico law clearly gave Kercado a property interest in her position; her status as a "career" employee permitted her to be fired only for "good cause." 3 L.P.R.A. § 1336 (1978).

Since Kercado had a property interest in her employment, the relevant constitutional question concerns what process is due her. The Supreme Court has stated:

do's claim for emotional and mental distress arising from the alleged October due process violation survives irrespective of the subsequent reinstatement. *Cf. Carey v. Piphus*, 435 U.S. 247, 263–64, 98 S.Ct. 1042, 1052–53, 55 L.Ed.2d 252 (1978).

Kercado also alleged in her complaint that the pretermination hearing granted her prior to the December 9, 1985, dismissal was constitutionally inadequate. The district court did not decide this issue, and we have no occasion to do so here.

An essential principle of due process is that a deprivation of life, liberty or property "be preceded by notice and opportunity for a hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950). We have described "the root requirement" of the Due Process Clause as being "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest in his employment." *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971) (emphasis in original); *see Bell v. Burson,* 402 U.S. 535, 542, 91 S.Ct. 1586, 1591, 29 L.Ed.2d 90 (1971). This principle requires "some kind of a hearing" prior to the discharge of an employee who has a constitutionally protected property interest in his employment. *Board of Regents v. Roth,* 408 U.S. at 569–70, 92 S.Ct. at 2705; *Perry v. Silnderman,* 408 U.S. 593, 599, 92 S.Ct. 2694, 2698–99, 33 L.Ed.2d 570 (1972).

*Cleveland Board of Education v. Loudermill,* 470 U.S. at 542, 105 S.Ct. at 1493.

The Secretary does not dispute that Kercado was entitled to a pretermination hearing prior to the first effort to dismiss her in October 1985. It is argued, however, that the administrative appeal which Kercado could have pursued was itself a pretermination hearing. The Secretary points out that the filing of an appeal by Kercado to the Board of Appeals would have suspended the effect of the dismissal order. She contends, therefore, that the availability of an administrative appeal provided Kercado with a pretermination hearing since the dismissal order would not become fully effective until after a final decision by the Board of Appeals.

■ We reject this argument. The dismissal order received on October 28 informed Kercado that the Secretary had acted to "permanently cancel your teacher certificate(s) ... and ... dismiss you from your post." The order stated that it be-

came "effective upon the service and receipt" of it by Kercado. The plain meaning of these words is that Kercado's discharge took effect on her receipt of the order on October 28. That the binding effect of such an order would be suspended upon the filing of an "appeal," does not transform that "appeal" into a pretermination hearing.[6] As the Eighth Circuit stated in the case of *Schultz v. Baumgart,* 738 F.2d 231 (8th Cir.1984):

> [I]f Schultz was indeed fired in violation of his due process rights, the availability of *post-deprivation* grievance procedures or a board hearing would not have cured the violation. Schultz was entitled to notice and a meaningful opportunity to respond *before* he was terminated. If he was terminated without those protections, the constitutional deprivation was then complete. Schultz need not have exhausted other state remedies before bringing his section 1983 claim.

738 F.2d at 237 (emphasis in original).

Kercado's opportunity to appeal the Secretary's order after being informed of the action is constitutionally inadequate; due process requires that she be given notice of the charges and an opportunity to respond *before* the action is taken. *Cleveland Board of Education v. Loudermill,* 470 U.S. at 546, 105 S.Ct. at 1496. We recognize that the Secretary was not obliged to conduct a full evidentiary hearing prior to dismissing Kercado. *Id.* at 545, 105 S.Ct. at 1495; *Moody v. Town of Weymouth,* 805 F.2d 30, 33 (1st Cir.1986). But Kercado was not given notice of the charges and any opportunity to respond prior to the Secretary's action on October 28. We affirm the district court's holding that her procedural due process rights were violated.

### The Motives Behind Kercado's Dismissal

■ The first amendment prohibits a government agency from dismissing public employees based on their political affiliation unless membership is an appropriate

---

**6.** This is especially true here because the filing of the appeal would still adversely affect Kerca-

do's rights; her employment and pay would be suspended until the Board's final decision.

requirement for a particular position. *Branti v. Frankel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). The parties agree that political affiliation is not a proper qualification for a school superintendent position.

■ The Secretary challenges the district court's conclusion that Kercado was dismissed for political purposes. At trial, Kercado bore the initial burden of demonstrating that her political affiliation was a substantial or motivating factor underlying the Secretary's decision to discharge her. *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 285–87, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977); *Rosaly v. Ignacio,* 593 F.2d 145, 148–49 (1st Cir.1979). Once that threshold showing had been met, the Secretary was obliged to demonstrate that Kercado would have been dismissed irrespective of her membership in the PNP. We cannot uphold the verdict unless the trial court correctly found that she would not have been dismissed "but for" her political affiliation with the PNP. *Mt. Healthy City School District v. Doyle,* 429 U.S. at 287, 97 S.Ct. at 576; *Rosaly v. Ignacio,* 593 F.2d at 149. The district court made extensive findings of fact with respect to the events leading up to Kercado's dismissal. These factual findings must be accepted unless we are "left with a definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *Scarpa v. Murphy,* 806 F.2d 326, 329 (1st Cir.1986).

■ The district court ruled that Kercado carried her initial burden of proving that her political affiliation was a substantial factor motivating her dismissal. Proof of such an improper motive may be shown via circumstantial evidence. *Rosaly v. Ignacio,* 593 F.2d at 149. The trial judge was aware of the highly charged political atmosphere in Puerto Rico following the PPD's election victory over the PNP in 1984. He highlighted Kercado's long, active and visible membership in the PNP. The evidence showed that the DPI Secretary and Undersecretary, the DPI Regional Director for the region which included the Dorado district, and the Regional Director's deputy, all were members of the PPD. The trial judge noted that one of the charges filed against Kercado was based solely on a statement by assistant superintendent Hector Lopez Maldonado, a well-known PPD member who had once run for mayor of Dorado. The evidence revealed that Kercado and Lopez had an extremely antagonistic relationship. The trial court held that the Secretary's willingness to appoint Lopez as assistant superintendent—despite widespread knowledge of his hostile relationship with Kercado and stronger support from the appointments committee for two other candidates—, and her refusal to investigate complaints about Lopez' conduct, evidenced her willingness to politicize personnel decisions. Finally, the trial court noted various instances in which the DPI officials investigating Kercado's conduct failed to elicit Kercado's version of the events underlying the charges against her. The court surmised that the investigators' conduct indicated that they were more interested in building a case against Kercado to support her dismissal than in actually assessing the merits of the charges against her. We agree with the district court that these circumstances, when taken together, support a finding that Kercado's political affiliation was a substantial factor motivating her dismissal.

After making this threshold determination, the trial court then focused on whether Kercado would have been discharged "but for" her political affiliation with the PNP. The court noted that in her eighteen years as a DPI employee, Kercado had never been reprimanded for her job performance, but instead had been "steadily rewarded for her work with job promotions." The court then undertook an evaluation of the merits of the four charges brought by the Secretary against Kercado.

The first charge levied against Kercado alleged that she failed to process fourteen teacher assistant appointments, in contravention of the order of Leida Cintron, the DPI Regional Director for Bayamon. The

committee assigned to appoint teacher assistants in Dorado met on August 20, 1985, but was able to agree on only three candidates. The district court found that the failure to select the other eleven candidates occurred in part because the Regional Director's deputy, Maria Cordova, refused to accept the committee's recommendations. The committee's inability to reach a consensus meant that Cintron herself would choose the remaining teacher assistants. On October 4, 1985, six weeks after the August meeting, Cintron sent Kercado a list of the additional eleven appointees. The Secretary avers that Kercado's failure to process the appointments within three days constituted an act of insubordination. The district court's analysis of the evidence on this point is unassailable. The court failed

> to see how defendant could honestly believe that plaintiff should have realized the urgency of the situation and processed the aides immediately when it took the Bayamon Regional Director, herself, over six weeks to make the selection—from August 20, 1985 when the committee to select the aides met and no consensus was reached, until October 4 when she sent plaintiff a letter with her choices for the appointments. Plaintiff claims she received the letter October 11, 1985 and she was dismissed October 28, 1985. This left her less than three weeks to process the appointments. Given the fact that the Regional Director never gave plaintiff a time limit to make the appointments and given the situation in plaintiff's office—that she was shorthanded and it was the beginning of a school year—all facts of which defendant was aware, we cannot find that defendant was sincere in believing plaintiff's conduct was a purposeful refusal to follow the directives of her superior or an overt act of insubordination worthy of dismissal.

The second and third charges brought against Kercado concerned her decision to keep two teachers working in the superintendent's office during August, 1985, after they had been reinstated to their regular teaching positions. The Secretary averred that such conduct was insubordinate, since it defied a DPI directive ordering that all personnel be located in the work unit to which they were assigned. An amendment to the directive provided that personnel could be reassigned from their permanent positions in order to take care of "special situations that may arise in a school or school district." Kercado maintained that her temporary use of the two teachers was prompted by the "special situation" of severe understaffing in her office. It is undisputed that Kercado's office was short on personnel during the summer of 1985. Indeed, on July 2, 1985, Kercado sent a letter to the Governor complaining that fourteen positions in her office remained vacant. She stated in the letter that she had unsuccessfully complained about the shortage through the proper channels. A copy of this letter was also sent to the Secretary. The Secretary does not deny that Kercado's office was suffering personnel shortages, but submits that "understaffing does not justify hierarchical disobedience."

The evidence shows that Kercado received permission to use the two teachers from their respective principals. There was no evidence that the temporary reassignment of the teachers disrupted the schools in which they worked. The trial judge found that temporary reassignments for "special situations" were expressly permitted by the June 29 amendment to the DPI directive on teacher reassignment. There was evidence that it has been a common practice to temporarily use teachers to perform administrative tasks in the superintendent's office. Moreover, neither the DPI directive on reassignments, nor its June amendment, specify particular procedures to be followed in order to temporarily use a teacher to meet the special needs of the district. The district court, therefore, concluded that with respect to charges two and three filed against Kercado there was no evidence "to indicate a purposeful act of insubordination by plaintiff which would warrant a dismissal."

The fourth charge against Kercado involved her dealings with assistant superintendent Hector Lopez Maldonado. As men-

tioned earlier, it was evident that there was considerable friction between Lopez and Kercado dating back long before he was assigned to work with her in the same office. Nevertheless, on September 19, 1985, slightly more than a month before Kercado was dismissed, the Secretary ignored the recommendation of the appointments committee and assigned Lopez to the position of assistant superintendent.

The Secretary charged Kercado with altering the duties of the assistant superintendent, thereby disrupting the smooth functioning of the Dorado office. Kercado claimed that Lopez refused to perform his assignments and caused problems for the staff in the office. There was ample evidence submitted by Kercado documenting complaints levied by Dorado district personnel against Lopez. In essence, this fourth charge involved a credibility contest between Lopez and Kercado: each testified of harassment and antagonism from the other; each accused the other of inhibiting the efficient operation of the Dorado superintendent's office; and there was evidence that political motives engendered the hostility they displayed toward one another. "[F]indings based on witness credibility are lodged firmly in the province of the trial court and we are loathe to disturb them absent a compelling showing of error." *Scarpa v. Murphy*, 806 F.2d at 328; *Anderson v. Bessemer City*, 470 U.S. at 575, 105 S.Ct. at 1512–13. The trial judge accepted Kercado's assertion that Lopez's abusive and uncooperative behavior forced her to relieve him of some of his duties. The court characterized the Secretary's charge that Kercado refused to give Lopez his proper assignments, as the "weakest" of all the allegations brought against her. Indeed, the trial judge stated that "it is not an unfounded conclusion that the Secretary, knowing the antagonism between plaintiff and Lopez, appointed Lopez as Assistant Superintendent in order to harass the plaintiff."

We see no reason to disturb any of the factual findings made by the district court. The Secretary, in effect, has sought to reargue to this court the merits of the charges it originally brought against Ker-

cado. The trial judge's assessment of the merits of those charges is entitled to considerable deference. *See Jimenez-Fuentes v. Torres-Gaztambide*, 807 F.2d 236, 238–39 (1st Cir.1986) (en banc), *cert. denied*, —— U.S. ——, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987); *De Choudens v. Government Development Bank*, 801 F.2d 5, 7 (1st Cir. 1986) (en banc), *cert. denied*, —— U.S. ——, 107 S.Ct. 1886, 95 L.Ed.2d 494 (1987). We agree with the district court that, even conceding the facial validity of the charges against Kercado, they are not so serious as to warrant the discharge of a capable eighteen-year career employee. The district court correctly concluded that, when the merits of these charges are considered, it is evident that they provide "little support for [the Secretary's] claim that [Kercado's] conduct was insubordinate requiring the termination of her employment with DPI." Accordingly, we affirm the district court's determination that Kercado would not have been dismissed "but for" her political affiliation with the PNP.

### Damages

■ The Secretary challenges the district court's award of compensatory and punitive damages. Kercado proved that she had been dismissed from her job for political reasons and had been deprived of her procedural due process rights. The district court reinstated Kercado and awarded her $12,074.50 in back pay. Based on our reading of the record and the briefs, this appears to be in error. The court apparently computed its back pay award from the date of plaintiff's dismissal, October 28, 1985. Appellants claim, however, that Kercado was paid through December 9, 1985, and she does not deny this. The court also granted Kercado $15,000 to compensate for the pain and suffering caused by the deprivation of her constitutional rights. Compensatory damages for mental and emotional distress are recoverable for violations of rights protected by section 1983. *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 2542–43, 91 L.Ed.2d 249 (1986); *Carey v. Piphus*, 435 U.S. 247, 264, 98

S.Ct. 1042, 1052–53, 55 L.Ed.2d 252 (1978). When reviewing a challenge to the basis of an award for compensatory damages, "we rely heavily on the judgment of the trial court, who has had the benefit of hearing all of the evidence and observing the demeanor of the witnesses." *Clark v. Taylor,* 710 F.2d 4, 13 (1st Cir.1983). Kercado testified of the emotional and mental distress caused by her abrupt dismissal on October 28 and by the Secretary's second, and more successful, effort to discharge her in December. We find the district court's award of $15,000 for compensatory damages reasonable under the circumstances.[7]

■ The trial judge also awarded Kercado $10,000 in punitive damages. The court concluded that the Secretary was "callously indifferent to plaintiff's federally protected rights," thus warranting the imposition of punitive damages. *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983); *Clark v. Taylor,* 710 F.2d at 14. The Secretary's conduct, as found by the district court, demonstrated a steadfast intent to discharge Kercado, irrespective of her constitutional rights or the actual merits of the charges brought against her. The award of punitive damages was therefore appropriate, and we do not find it excessive.

*Affirmed and remanded for a recomputation of the back pay award. Costs awarded to appellee.*

BREYER, Circuit Judge (dissenting).

I do not disagree with the majority about the basic principles of federal law that apply to this case. On the one hand, a person who claims that someone has violated his civil rights may bring suit in federal court under 42 U.S.C. § 1983 without exhausting remedies that state law makes available. *See Patsy v. Board of Regents,* 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). On the other hand, *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny hold that if a state has already begun a state judicial or administrative proceeding against a person, that person may not proceed in federal court, even with a § 1983 suit, if that suit risks interfering with important state interests and if the federal plaintiff can raise constitutional challenges in the state proceedings. *Middlesex County Ethics Committee v. Garden State Bar Association,* 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982) (setting out basic test for invoking *Younger*-type abstention); *see Ohio Civil Rights Commission v. Dayton Christian Schools,* 477 U.S. 619, 106 S.Ct. 2718, 2723, 91 L.Ed.2d 512 (1986) (extending the *Younger* doctrine, in the context of a § 1983 action, to state administrative proceedings).

I disagree with the majority, however, about the application of those principles to this case. I think the plaintiff was, when she brought her federal suit, very much in the midst of Commonwealth administrative proceedings. In the Commonwealth, as in many states, local authorities cannot dismiss a tenured teacher without fairly elaborate administrative proceedings that involve notice of charges, a full-blown administrative hearing, and either an administrative appeal, judicial review, or both. P.R. Laws Ann. tit. 18, §§ 274–274o; *see, e.g.,* Cal. Educ. Code §§ 44932–44945; N.J.Stat. Ann. §§ 18A:6–10 to –27; Wash.Rev. Code §§ 28A.70.160–.170. Puerto Rico's statute provides that to "cancel" or "suspend" a tenured teacher's educational certificate, the "Secretary of Education ... shall serve on the teacher an order of suspension or

---

7. The court below did not specify how much of these compensatory damages stemmed from the deprivation of her procedural due process rights, and how much stemmed from the improper dismissal. The Supreme Court has stated that a federal plaintiff alleging a procedural due process violation must "convince the trier of fact that he actually suffered distress because of the denial of procedural due process itself." *Carey v. Piphus,* 435 U.S. at 263, 98 S.Ct. at 1052.

Here, Kercado testified that she suffered distress ever since the Secretary's action on October 28, when her procedural due process rights were violated. She also testified of the distress she suffered due to the actual loss of her job. We do not think the failure to identify the portion of compensatory damages arising from each claim to be of consequence under the circumstances of this case.

cancellation ... jointly with a complaint specifying the charges." P.R. Laws Ann. tit. 18, §§ 274, 274a. The order "shall be final" after ten days only if the teacher does not "appeal" from it. P.R. Laws Ann. tit. 18, § 274b. With a few possible exceptions not here relevant, the order (regardless of what it says) legally takes effect only *after* the Board of Appeals of the Public Education System holds a full public hearing on the record, at which the teacher may be represented by counsel, present evidence, and cross-examine the witnesses presented by the education authorities. P.R. Laws Ann. tit. 18, §§ 274d–274h. If the Board decides against the teacher, he may obtain judicial review in the Commonwealth courts. P.R. Laws Ann. tit. 18, § 274*l*.

How can the majority find that the plaintiff was not in the midst of this procedure when she brought her federal law suit? The majority seems to do so only by artificially separating the statute's "sending-the-order" provision from the rest of the statute. The majority reads the "sending-of-the-order" provision as if it permitted the Commonwealth to dismiss a teacher without a full-blown hearing simply by sending the piece of paper called an "order", as if the sending of that piece of paper constituted the legal wrong and all the rest provided by the statute were but a state remedy. In any contested case, however, the sending of the "order" and the hearing on "appeal" are steps within an integrated, statutory administrative scheme—a scheme similar to those often used by states to dismiss tenured teachers. Unless one viewed Puerto Rico's law as embodying an effort to dismiss tenured teachers without a hearing (which neither the statutory language nor common sense suggest is so) this case fits squarely within the *Younger* doctrine. Regardless, even if one calls the hearing stage an administrative "appeal" from the sending of the "order," relevant Supreme Court precedent would still seem to require the plaintiff to take such an appeal before bringing her § 1983 action in federal court. *Pennzoil v. Texaco*, —— U.S. ——, 107 S.Ct. 1519, 1527 & n. 13, 95 L.Ed.2d 1 (1987) (holding in the context of a § 1983 suit that the availability of a judicial appeal

renders a proceeding "pending" for purposes of *Younger*-type abstention); *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 607–09 & n. 21, 95 S.Ct. 1200, 1211 & n. 21, 43 L.Ed.2d 482 (1975) (holding that "a necessary concomitant of *Younger* is that a party ... must exhaust his state appellate remedies before seeking relief in the District Court" and noting that according such deference to already-initiated state proceedings is consistent with a general no-exhaustion doctrine); *see Patsy v. Board of Regents*, 457 U.S. at 518–19, 102 S.Ct. at 2568–69 (White, J., concurring in part) (noting that the Court's holding in *Patsy* "is also fully consistent with [the Court's] decisions that a defendant in a civil or administrative enforcement proceeding may not enjoin and sidetrack that proceeding by resorting to a § 1983 action in federal court" (citing *Huffman* )); *see also Malachowski v. City of Keene*, 787 F.2d 704, 708 (1st Cir.) (holding that a § 1983 plaintiff must first take available state appeals), *cert. denied*, —— U.S. ——, 107 S.Ct. 107, 93 L.Ed.2d 56 (1986); *Coruzzi v. New Jersey*, 705 F.2d 688, 690 (3d Cir.1983) (similar); *Carter v. Maryland Commission on Medical Discipline*, 639 F.Supp. 542, 546 (D.Md. 1986) (similar). For these reasons, it seems to me the majority's view both misreads Puerto Rico's law and, in any event, runs contrary to relevant Supreme Court authority.