Miriam ESTRADA–IZQUIERDO,
Plaintiff, Appellee,

v.

Awilda APONTE–ROQUE, etc.,
Defendant, Appellant.

No. 87–1567.

United States Court of Appeals,
First Circuit.

Heard Dec. 7, 1987.
Decided June 28, 1988.

Carlos Del Valle with whom Marcos A. Ramirez Irizarry, Ramirez & Ramirez, Hato Rey, P.R., and Hector Rivera Cruz, Secretary of Justice, were on brief, for defendant, appellant.

Pedro Miranda Corrada, San Juan, P.R., with whom Hector Urgell Cuebas was on brief, for plaintiff, appellee.

Before BOWNES and SELYA,
Circuit Judges, and LAFFITTE,*
District Judge.

BOWNES, Circuit Judge.

Awilda Aponte Roque (Aponte), Secretary of Puerto Rico's Department of Public Education (the Department), appeals from a judgment of the district court reinstating Miriam Estrada Izquierdo (Estrada) as superintendent of schools for the Maricao School District. The district court found that Estrada's ouster from that position, and her assignment to a specially-created

* Of the District of Puerto Rico, sitting by designa- tion.

position as assistant superintendent in the same district, was effected by Aponte for political reasons, in violation of Estrada's first amendment rights. Estrada is a member of the New Progressive Party (Partido Nuevo Progresista or PNP) while Aponte is a member of the Popular Democratic Party (Partido Popular Democratico or PPD). Aponte argues that the district court's finding of political motivation was clearly erroneous or, alternatively, that the district court should have abstained from exercising federal jurisdiction in order to avoid interfering with a comprehensive state personnel regulatory scheme. Aponte also argues that the district court erred in awarding Estrada back pay. We affirm in part, reverse in part and remand.

## I. FACTUAL BACKGROUND

This case arises from a court-approved settlement of another political demotion case, which resulted in Estrada's predecessor, a member of the PPD, being appointed to the position from which Estrada was removed. The background lies in two recent Puerto Rico elections, each of which resulted in the ruling party being swept out of power. In 1976, it was the PNP replacing the PPD, in 1984 vice versa. Each change in power has resulted in a multitude of personnel changes spawning numerous lawsuits alleging unconstitutionally politically motivated firings and demotions. Many of these lawsuits, involving one election or another, have reached this court. *E.g., Rivera Fernandez v. Chardon*, 648 F.2d 765 (1st Cir.) (1976 election), *rev'd*, 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981), on remand, 681 F.2d 42 (1st Cir. 1982), *aff'd sub nom. Chardon v. Fumero Soto*, 462 U.S. 650, 103 S.Ct. 2611, 77 L.Ed. 2d 74 (1983); *Kercado Melendez v. Aponte Roque*, 829 F.2d 255 (1st Cir.1987) (1984 election); *Kauffman v. Puerto Rico Telephone Co.*, 841 F.2d 1169 (1st Cir.1988) (1984 election). This case involves both elections.

In July of 1976, while the PPD was still in power, Carlos Humberto Vega (Vega), an active member of the PPD, was appointed as superintendent of schools for the Maricao School District on a substitute basis.[1] In April of 1977, after the change in political power to the PNP, Vega requested that his status be changed from substitute to probationary, in order that he could eventually gain tenure or permanency in the position. Instead, on July 1, 1977, Vega was removed from the superintendency and reinstated to his prior position of assistant superintendent. Along with several other displaced educators, Vega brought suit in the Commonwealth Superior Court against Carlos Chardon, then Secretary of the Department of Public Education and a member of the PNP, alleging that his demotion was politically motivated and violated his statutory and constitutional rights.

In May of 1980, the superior court handed down a partial judgment in Vega's case. *Cabiya v. Chardon*, Civ. No. PE–77–942 (May 16, 1980). The court held that Vega had no statutory right to a change in his status from substitute to probationary, and thus that he had no claim to tenure under state law. The court, however, reserved judgment until a later date on Vega's constitutional claims. Those claims were still unresolved in 1981 when Estrada was elevated from assistant superintendent to superintendent in Maricao. Estrada was aware that Vega had sued, claiming a right to the superintendency, and that his claim had been rejected by the superior court on statutory grounds. But Estrada was not aware that Vega's constitutional claims were still pending. Estrada remained superintendent without incident until January of 1986. During her time as superintendent, she admittedly satisfied all the requirements to obtain tenure in the position.

Meanwhile, in the 1984 elections, Estrada's party, the PNP, was removed from power and the PPD voted in. Aponte became Secretary of the Department in the new administration, and Vega's slow-mov-

---

**1.** The prior occupant of the position still maintained a permanency or property interest in the position.

**12**

ing political discrimination case took on a new and interesting posture. Aponte, a member of Vega's own political party, now became the defendant against charges that Vega should be reinstated because the prior secretary had discriminated against Vega on account of his political affiliation. At the same time, the superior court judge overseeing the case set a trial date and began pressing the parties to reach a settlement.

In October of 1985, an attorney at the Department of Justice (DOJ), who was handling the defense of Vega's case, wrote to Elba Rodriguez Fuentes (Rodriguez), the head of legal affairs at the Department of Public Education, about Vega's claims. The letter mentioned that the presiding judge was urging settlement and requested that the Department investigate Vega's qualifications to be a superintendent. The matter was assigned to Alba Nydia Caballero Fuentes (Caballero), the Assistant Secretary for Personnel, who reported back to Rodriguez that Vega could be considered qualified. Rodriguez did not at that time make any recommendation regarding settlement, but left the matter with Caballero, herself an attorney, who was in charge of the matter for the Department.

In the course of her work on Vega's case, Caballero conferred with an Assistant Secretary at DOJ who indicated that DOJ was recommending settlement because it believed its case was weak. DOJ did not recommend that Vega necessarily be reinstated at Maricao, but only advised that some settlement be reached. Indeed, DOJ forwarded to the Department Vega's own proposed settlement, under which he would be made superintendent in Lajas, not Maricao. Vega was then occupying the Lajas position on an interim basis.

Nevertheless, Caballero, on her own accord, determined that Vega could be reinstated only in Maricao. Caballero reasoned that, under the applicable personnel regulations, if Vega had not been removed in

1977, he would have earned tenure in the Maricao superintendency. Under the Puerto Rico Permanency Act, P.R. Laws Ann. tit. 18, § 214, such tenure is specific to a particular municipality.[2] Thus, reasoned Caballero, any settlement would have to involve the Maricao position and no other. There would be no problem in removing Estrada from the Maricao position, Caballero concluded, because her purported tenure in the position was actually null under state law since Vega's right to occupy the position was still the subject of litigation. Caballero eventually recommended a settlement, which included reinstating Vega at Maricao. Aponte approved it. Although the actual settlement was executed by DOJ, it is conceded that the settlement would not have been entered into without Aponte's approval. A judgment embodying the settlement was entered by the superior court on November 25, 1985.

Estrada knew nothing about these 1985 settlement negotiations, and neither DOJ nor the Department informed her that they were considering a settlement that would involve appointing Vega to the position she occupied. Estrada first learned that she was being demoted in January 1986, a month after the settlement, when she was summoned to a meeting with Caballero and an undersecretary at the Department. There Estrada was handed a letter, signed by Aponte, stating that she was being removed from her position in accordance with a judgment of the superior court. The letter did not mention that the judgment had been entered pursuant to a settlement, nor did it mention who, if anyone, would be replacing Estrada. When Estrada asked for an explanation, she was not given one but was instead referred to the superior court for more information. The day after receiving the letter, Estrada wrote a letter to Aponte protesting her removal as a violation of her statutory constitutional rights.

## II. PROCEEDINGS BELOW

Meeting with no success on her protest, on February 10, 1986, Estrada filed a com-

**2.** After describing the requirements for permanency, the relevant portion of the Act provides: "Such teachers shall be entitled to be contracted as permanent teachers in the municipality where they may be teaching at the expiration of the probationary period." P.R.Laws Ann. tit 18, § 214.

plaint against Aponte in United States District Court for the District of Puerto Rico. The complaint alleged two causes of action under 42 U.S.C. § 1983. First, Estrada claimed that, as a permanent superintendent, she could be demoted only for good cause after a hearing and that her firing without notice violated her right to due process under the fourteenth amendment. Second, Estrada claimed that her demotion was due solely to the fact that she was a member of the PNP, and thus constituted political discrimination in violation of the first amendment. The complaint named Aponte both individually and in her official capacity as Secretary. It requested preliminary and permanent injunctive relief reinstating Estrada, and $250,000 for compensatory damages and the same amount in punitive damages.

The district court bifurcated the case into injunctive relief and damages phases, and a one day preliminary and permanent injunction hearing was held on February 23, 1987. Estrada testified at the hearing, recounting her experience as an educator and the circumstances surrounding her demotion. She also presented the testimony of an associate who attended the meeting at which Estrada was given her dismissal letter. Rodriguez, Caballero and Aponte testified for the defense. They discussed their involvement in Estrada's demotion and denied either knowing of or acting on account of Estrada's political affiliation. On cross-examination, Aponte also testified about another personnel action involving Sigfredo Alvira, a former school superintendent. Approximately a year earlier, Alvira had been transferred from his superintendent position to a job in the central office of the Department. Both of Alvira's jobs were in a similar category and he was able to retain his status as a permanent employee. Aponte claimed, however, that neither Estrada nor Vega could have been similarly transferred to a vacant superintendency in order to avoid a conflict over the right to occupy the Maricao position.

Discrediting much of Aponte's testimony, the district court ruled for Estrada. The court found that Aponte was aware of the relative party affiliations of Vega and Estrada and "that the settlement was reached to discriminate against [Estrada] because of her political affiliation." This conclusion was based on a number of factors. First, there was the obvious fact that Vega was a member of the PPD, Aponte's party, while Estrada was a member of the opposition PNP, and the settlement favored Vega over Estrada. Second, the district court found that Aponte could have transferred Estrada to a vacant superintendency—and there were five such vacancies—but failed to do so. Third, it was noted that Vega did not request reinstatement at Maricao, but instead indicated a desire to stay in Lajas and become permanent superintendent there. Fourth, Estrada was appointed as an assistant superintendent in Maricao, although Maricao already had two assistant superintendents. As an assistant, Estrada was given little work to do even though she had more work experience than her coworkers. The district court also found that Estrada was assigned to an unpleasant stint as substitute principal in a rural area. Fifth, the district court noted the testimony of Rodriguez, who said that she did not recommend a settlement in Vega's case because Aponte told her it was a "personal" matter. Having ruled for Estrada on her first amendment claim, the court did not discuss her claim for denial of due process.

The district court ordered Aponte to remove Vega from the superintendency and to reinstate Estrada. It ruled that the prior superior court judgment reinstating Vega posed no obstacle to Estrada's reinstatement.

We agree with defendant that this Court should give full faith and credit to the Superior Court's judgment of November 29, 1985, incorporating the settlement of the case of Mr. Vega. However, this Court must only give that full faith and credit that by law and usage the local courts in Puerto Rico will give to that settlement. 28 U.S.C. § 1738. We believe that the Commonwealth Courts would not order the reinstatement of Mr. Vega because the settlement was

reached to discriminate against Ms. Estrada.

Without explanation, the district court also awarded to Estrada full back pay, that is, the difference in salary between the superintendent and assistant superintendent positions for the time after Estrada's demotion.

## III. THE FINDING OF POLITICAL DISCRIMINATION

There is no dispute that the district court applied the correct law. The court ruled that Estrada "bore the initial burden of demonstrating that her political affiliation was a substantial or motivating factor underlying the Secretary's decision" to demote her. *Kercado Melendez v. Aponte Roque*, 829 F.2d 255, 264 (1st Cir.1987) (citing *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 285–87, 97 S.Ct. 568, 575–76, 50 L.Ed. 2d 471 (1977)); *Rosaly v. Ignacio*, 593 F.2d 145, 148–49 (1st Cir.1979). If Estrada met that burden, Aponte was then required to demonstrate by a preponderance of the evidence that Estrada would have been demoted irrespective of her membership in the PNP.[3] *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 416, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979); *Kercado Melendez*, 829 F.2d at 264. The basic inquiry is whether, "but for" her membership in the PNP, Estrada would not have been ousted as superintendent. *Kercado Melendez*, 829 F.2d at 264. Having identified these principles, the district court concluded that Estrada had made out a *prima facie* case of political discrimination, which Aponte had not successfully rebutted.

In reviewing the district court's opinion, we must accept its factual findings unless they are clearly erroneous. Fed.R.Civ.P. 52(a); *see Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed. 2d 518 (1985) ("A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.") (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)); *Kercado Melendez*, 829 F.2d at 264. Moreover, "[w]hen findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson*, 470 U.S. at 575, 105 S.Ct. at 1512.

■ Applying these rules to the present case, the central question is whether the district court clearly erred in finding that Estrada's party affiliation was "a substantial or motivating factor" in Aponte's decision to enter into this particular settlement of Vega's lawsuit and to demote Estrada. In approaching this question we assume that Vega's lawsuit had some merit and that some form of settlement was legitimate and justified. But there were, at least theoretically, many conceivable ways to settle the case, including awarding Vega damages but not reinstatement, or appointing him to a vacant position. Additionally, even if Vega was reinstated at Maricao, Estrada might have been given another superintendency rather than a demotion. The question is thus whether it was clear error to find that entering into a settlement which resulted in Estrada's demotion, as opposed to some other arrangement, was politically-motivated.

Other than Aponte's own testimony, which the district court specifically discredited, the only evidence in the record on this issue is circumstantial. We have previously held that such circumstantial evidence can be sufficient to support a finding of political discrimination. *Kercado Melendez*, 829 F.2d at 264; *Rosaly*, 593 F.2d at 149 ("We acknowledge that circumstantial

---

**3.** As in *Kercado Melendez*, the parties have agreed "that political affiliation is not a proper qualification for a school superintendent." 829 F.2d at 264; *see Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

evidence may be used to show discriminatory motive in a patronage dismissal case."). Here, again, we have no trouble concluding that there is sufficient circumstantial evidence to support the district court's finding.

To begin with, we are confronted by the fact that, although Estrada had successfully carried out her job as superintendent since 1981, discussions concerning her removal began shortly after the PPD took power in 1985. We are also aware, as the district court was, "of the highly charged political atmosphere in Puerto Rico following the PPD's election victory over the PNP in 1984." *Kercado Melendez*, 829 F.2d at 264. Certainly, the fact that Estrada and Aponte belong to different political parties is not, in and of itself, a sufficient basis for the finding of discriminatory motive. But in combination with the timing of the election and of Estrada's demotion, it is probative circumstantial evidence.

The manner in which Estrada was notified of her dismissal is another piece of evidence supporting the district court's finding. Throughout the 1985 negotiations with Vega, during which the Department was considering reinstating him at Maricao and was evaluating his qualifications for that post, neither Aponte nor anyone else under her supervision informed Estrada of her possible demotion. With advance notice, Estrada might have intervened in Vega's case and sought to alter the settlement or to prevent judicial approval of it. She might also have requested a transfer or otherwise participated in the decision concerning the job to which she should be assigned if Vega took over hers. Instead, Estrada learned of the settlement and was demoted on the same day, more than a month after the settlement was approved. And the letter she received at that time was manifestly misleading, implying that a court had actually adjudicated Vega's right to the superintendency, not simply approved a settlement. To add insult to inju-

ry, the Department officials who gave Estrada the letter refused to answer her questions about the action.

Perhaps the most probative evidence supporting the finding of political discrimination is the fact that Aponte made no effort to mitigate the effects of settling Vega's case by offering either Vega or Estrada another superintendency. Caballero and Aponte testified that such transfers were not possible, but the district court discredited their testimony and found that transfers could be made. We agree with the district court that Aponte's "no transfer" position is not persuasive.[4] In order to explain this conclusion, however, it is necessary to delve briefly into the applicable Puerto Rico laws and regulations, examining the provisions cited by Aponte and Estrada, as well as Aponte's related argument relating to federal abstention.

Aponte's "no transfer" policy was purportedly based on two provisions, the Permanency Act, P.R.Laws Ann. tit. 18, § 214, and Article 7.9 of the Personnel Bylaws of the Central Office of Personnel Administration. As noted above, *see* note 2 and accompanying text *supra*, the Permanency Act provides that permanency, once earned, is given in the municipality where a teacher is teaching at the end of the probationary period. As Aponte points out, this implies that permanency is not automatically transferable to other municipalities. Article 7.9 provides in relevant part:

> PROVISIONAL APPOINTMENTS. In every position created for a fixed term, the appointment will be provisional. Similarly, the appointments will be provisional in permanent positions in the following circumstances: ... (4) When the incumbent of the position has been dismissed and has appealed this action before the [Appeals] Board [of the System of Personnel Administration].

Although it is not clear that Vega was an "incumbent" in the Maricao position be-

---

4. The dissent suggests, *infra* at 20, that the "no transfer" policy was not actually Aponte's, but "formulated independently by Caballero." At trial, however, Aponte herself testified at length that in her own view a transfer for either Estrada or Vega was impossible under the applicable regulations. Whether or not initially proposed by Caballero, then, the policy was wholeheartedly endorsed by Aponte and it can be fairly described as hers.

cause he occupied it only on a substitute basis, and although Vega never appealed his dismissal to the Board, Aponte's position is that, under Article 7.9, whenever someone like Vega is litigating his right to occupy a particular position, the person actually occupying it—here, Estrada—can hold the position only on a provisional and not a permanent basis. Thus, says Aponte, in settling Vega's claim, her hands were tied. Vega could have earned permanency only in Maricao and could be reinstated only there. And Estrada could not have earned permanency because her appointment was provisional.

Indeed, Aponte goes on to argue that, in reinstating Estrada, the district court abused its discretion by interfering with this comprehensive personnel regulatory scheme instead of abstaining under principles enunciated in *Railroad Commission v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). We think Aponte's abstention argument is misplaced. The statutory and regulatory provisions she relies upon go only to the question of whether Estrada and Vega have tenure or permanency in the superintendency. Such permanency is relevant to Estrada's claimed denial of due process—a question on which the district court did not rule and which is not now before us—but it is not determinative of the question at hand: whether Estrada's demotion was politically motivated.[5] A political dismissal is no less offensive to the first amendment because the person dismissed does not have tenure. Vega himself did not have tenure and yet Aponte saw fit to reinstate him, at least in part, because of his allegedly political demotion. Likewise, even if Estrada did not have tenure because of some technical difficulty under Article 7.9, she would still have a cause of action against Aponte if Aponte demoted her because of her political affiliation. The district court's finding of political discrimination therefore does not impermissibly interfere with Aponte's purported interpretation of the permanency laws and regulations.[6]

Beyond the legal question of abstention, however, there is the factual issue of whether Aponte's purported reliance on the rules was evidence sufficient to refute Estrada's allegation of political motivation. On this point, we agree with the district court that Aponte's position is not credible. First, in addition to the personnel rules cited by Aponte, there is Article 9.2 of the Regulations for the Teaching Personnel of the Department of Education, identified by the district court, which authorizes transfers of teaching personnel. Article 9.2 provides in relevant part:

Transfers will be used as a mechanism for the placement of employees in a position that will lead them to be satisfied with their work and to contribute, through their efforts, to attain the objectives of the Department of Education more efficiently.

1. *Objectives of the Transfers*

a. The teaching personnel that holds [sic] a permanent, probatory [sic], and transitory status may be transferred from one school district to another and from one municipality to the other upon the personnel's official request or when there are special needs in situations such as the following:

1. Lack of enrollment
2. Elimination of programs
3. Elimination of projects or courses
4. Offering of equal opportunity of educational services
5. Taking care of special situations that may occur in a school, school district, educational region or program

---

5. In argument before the district court, Aponte's counsel raised abstention only in the context of Estrada's due process claim. *See* Hearing Transcript at 78.

6. In addition to finding political discrimination, the district court, at the end of its opinion, also noted disagreement with Aponte's interpretation of the regulation, and maintained that Estrada was entitled to permanency. We do not interpret this statement as a holding of the court because it was unnecessary both to the finding of discrimination and to the relief granted. Accordingly we do not review it.

that require additional human resources.

. . . . .

c. If the employee's services are deemed to be utilized more fruitfully in another office, school district, or region of the Department because of his knowledge, experiences, skills, or special qualifications, particularly if the latter has acquired more knowledge and abilities through training received.

. . . . .

2. *Areas of Transfers*

Transfer of reaching personnel may be made from:

a. one municipality to another

b. one school district to another

c. one educational region to another

d. the Central Office to an educational region or district

e. the Department of Education to another government agency.

It is important to note that this rule in no way conflicts with the rules cited by Aponte; it does not discuss when and where permanency can be earned, but simply provides that permanent *and* nonpermanent employees may be transferred. On its face, it seems that it could apply to Estrada and Vega, authorizing Aponte both to transfer Vega to the vacant superintendency in Lajas and to transfer Estrada to a vacant post.

During her testimony, Aponte tried to defuse the import of this regulation for both Vega and Estrada. In Vega's case, Aponte said that he could not have been transferred to Lajas because he qualified for permanency only in Maricao, and had not competed in Lajas. The regulation does not require this, however, and Aponte admitted that she authorized a transfer for Sigfredo Alvira from a superintendency for which he had competed to another permanent position for which he had not. Moreover, we cannot ignore the fact that, in comparing the Vega and Alvira cases, Aponte's testimony was evasive, often resisting or refusing to answer counsel's questions, and that she never articulated a meaningful distinction between the two cases.

As for Estrada, Aponte testified that Estrada had never requested a transfer, implying that such a request was a prerequisite for a transfer. The district court disagreed, interpreting the regulation not to require a request. We need not go that far, however, in order to affirm to finding of political discrimination, because Aponte's failure to notify Estrada of her impending demotion effectively prevented a timely request. Moreover, for purposes of scrutinizing Aponte's motive, the point is not whether Aponte actually could have transferred—or, for that matter, whether, as the dissent suggests, *infra* at 20, she was required to transfer—Estrada *after* Estrada's abrupt dismissal in January. Rather, the point is that, had Aponte timely chosen to pursue it, transferring might have provided a mechanism to alleviate the conflict over the Maricao superintendency, especially since five other superintendent positions were available. Aponte's failure even to explore this option is further evidence corroborating the district court's finding of discriminatory motivation.

Ironically, although Aponte did not attempt to transfer either Vega or Estrada, she did transfer a vacant assistant superintendent *position* from another district into Maricao, and then placed Estrada in that position. At the time, Maricao already had two assistants and a third apparently was not needed. Thus, as could be anticipated, Estrada had little work to do in her new job. We do not think that Aponte can be blamed for the specific incidents of mistreatment that Estrada allegedly encountered in her new job. But, by placing Estrada in a position where her talent and experience were not needed, Aponte demonstrated a disregard for Estrada's employment environment. This is consistent with discriminatory intent.

For purposes of review, we have ignored Rodriguez's purported testimony that she did not recommend a settlement of Vega's case because Aponte told her this was a "personal" matter. We think it very likely that, as Aponte has argued, this was an

auditory mixup, Rodriguez actually having referred to Vega's case as a "personnel" matter. As a "personnel" matter, it fell within Caballero's bailiwick, not Rodriguez's. Nevertheless, we believe there is ample evidence, independent from this and in addition to the mere difference in party affiliations, to support the conclusion that Aponte acted to discriminate against Estrada. We acknowledge that much, if not all, of this circumstantial evidence might also be viewed as consistent with Aponte's version of events. But, as the Supreme Court has said, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574, 105 S.Ct. at 1511.

We also note that we do not view the finding of discriminatory motive here as inconsistent with the deference due the superior court judgment. As we discuss *infra*, the full faith and credit due that judgment poses a troubling question with regard to the relief granted by the district court, because that relief directly conflicts with the judgment. But there is no direct conflict here. Even if, as a nonparty, Estrada could be said to be bound by issues adjudicated by the superior court, that court never adjudicated the issue of Aponte's motive in entering into the settlement. Indeed, the superior court only approved a settlement and did not "adjudicate" any part of Vega's political discrimination claim. In upholding the district court's conclusion, we certainly do not mean to question the motives or competence of the superior court judge in Vega's case, who approved a facially legitimate settlement—a settlement that does not even mention the displacement of Estrada. We find, however, no basis for overturning the district court's finding.

---

7. 28 U.S.C. § 1738 provides that state and territorial statutes and judicial proceedings "shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken."

## IV. RELIEF

The district court ordered Aponte to reinstate Estrada and to give her back pay. Aponte challenges both rulings, which we address separately.

 It goes without saying, of course, that the usual remedy for unconstitutional dismissal is reinstatement. The district court's reinstatement order thus followed logically from its finding of political discrimination and, under normal circumstances, we would have no difficulty affirming it. But, here, we are confronted by an outstanding judgment of the Commonwealth Superior Court stating that Vega, not Estrada, is entitled to the Maricao position. Under 28 U.S.C. § 1738, federal courts are required to respect that judgment, at least insofar as commonwealth courts themselves would.[7]

Without citing a single case, the district court concluded that commonwealth courts would not respect the superior court judgment in Vega's case because of Aponte's discriminatory intent in approving it. We are hesitant to endorse this cursory analysis as a basis for avoiding giving full faith and credit to a state court judgment. We are, however, also "reluctant to interfere with a reasonable construction of state law made by a district judge, sitting in a state who is familiar with that state's law and practices." [8] *Rose v. Nashua Board of Education*, 679 F.2d 279, 281 (1st Cir.1982). "This is particularly so with regard to the case law of Puerto Rico because the district court there has greater access to and ability to interpret that law in its original language than we do." *Kauffman v. Puerto Rico Telephone Co.*, 841 F.2d 1169, 1173 n. 6 (1st Cir.1988) (citing *Roure v. Hernandez Colon*, 824 F.2d 139, 142 (1st Cir.1987); *Berrios Rivera v. British Ropes, Ltd.*, 575 F.2d 966, 968 (1st Cir.1978)).

---

8. We are at a loss to understand the dissent's assertion that "[i]t has not been seriously suggested that, on a motion or in a proceeding prosecuted on Vega's behalf, the courts of Puerto Rico would not enforce the *Cabiya* decree against the Secretary." *Infra* at 23. As quoted *supra* at 13, the district court held precisely that. We find no grounds for characterizing the district court's holding as other than "serious."

Moreover, Aponte, as appellant, has utterly failed to argue or present any legal basis for overturning the district court's construction of Puerto Rico law. Aponte's only argument regarding full faith and credit is this:

> Furthermore, under these circumstances we submit that the district court acted contrary to 28 U.S.C. § 1738, when it set aside the judgment in the *Cabiya* case because it believed "that the Commonwealth of Puerto Rico would not order the reinstatement of Mr. Vega because the settlement was reached to discriminate against Ms. Estrada." In essence, the district court collaterally impermissibly attacked the full faith and credit of the *Cabiya* judgment. *We submit that given the failure to demonstrate discriminatory animus, said judgment must be respected.*

Appellant's Brief at 35–36 (citations omitted) (emphasis added). Aponte's complaint here is not with the district court's statement of the governing law; she apparently agrees with the district court that, where a discriminatory motive for entering into a settlement is established, the judgment incorporating the settlement need not be respected.[9] In light of our upholding the finding of discriminatory motive in this case, we are, therefore, constrained to affirm the reinstatement of Estrada.

■ As we noted at the outset, the district court divided this case into injunctive relief and damages phases, and the hearing and judgment at issue pertained only to the injunctive aspect. The issue of damages was reserved for a later day, and the court did not allow the parties to introduce any evidence on that subject at the injunction hearing. Nevertheless, and without explanation, the district court awarded full back pay to Estrada. Aponte argues that this was error, and we agree.

We have previously held that "back pay and reinstatement remedies are entirely distinct." *Rivera Fernandez v. Chardon,* 681 F.2d 42, 59 (1st Cir.1982), *aff'd sub nom. Chardon v. Fumero Soto,* 462 U.S. 650, 103 S.Ct. 2611, 77 L.Ed.2d 74 (1983). Back pay is not "ancillary" to the injunctive remedy. *Id.* Because the hearing was on injunctive relief only, it was error for the district court sua sponte to reach the separate question of damages, without giving the parties notice or opportunity to be heard on that issue. The award of back pay is therefore reversed and the case is remanded for a hearing on damages, at which Aponte will have the opportunity to raise any possible defenses.

*The judgment of the district court is affirmed with respect to reinstatement, reversed with respect to the award of back pay and remanded.*

SELYA, Circuit Judge (dissenting).

If I may borrow a phrase from an English poet,[1] my colleagues, I fear, are "straining at particles of light in the midst of a great darkness" in a well-intentioned— but fundamentally flawed—effort to give the district court the deference that Fed.R. Civ.P. 52(a) demands. Though that deference is considerable in the context of facts found during a bench trial, I think that the majority carries it to an impermissible extreme. For that reason, and because I believe that the opinion fails to accord full faith and credit to a judgment of the Puerto Rico Superior Court, I respectfully dissent.

---

**9.** We must note that, although the dissent attacks the district court's reason for not giving the superior court decree full faith and credit as an *ipse dixit,* it does not mention the appellant's agreement with the district court's statement of Puerto Rico law, nor does it cite any Puerto Rico cases to the contrary.

Furthermore, in at least one case, the Puerto Rico Supreme Court has refused to recognize the validity of and to enforce an arbitration award in derogation of a group of employees' rights arrived at without participation of the affected employees, *F.S.E. v. J.R.T.,* 111 D.P.R. 505 (1981), notwithstanding that pursuant to both national and Puerto Rico labor policies, arbitration awards enjoy a higher degree of deference than court judgments. *See United Paper Workers Int'l Union v. Misco, Inc.,* —— U.S. ——, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987); *Nazario v. Superior Court,* 98 P.R.R. 827 (1970).

**1.** John Keats, *Letter to George and Georgiana Keats* (Mar. 19, 1819).

### A.

In this case, the district court's conclusions rested largely (if not exclusively) on a quartet of points:

1. The Secretary, a PPD member, was aware of plaintiff's membership in the PNP. *Estrada Izquierdo v. Aponte Roque*, Civ. No. 86–0195, slip op. (D.P.R. May 4, 1987) (hereinafter "Slip op.") at 14.

2. The Secretary could have offered plaintiff a superintendent's position in another district, but did not. *E.g., id.* at 11, 12.

3. In Estrada's "new" role as an assistant superintendent in Maricao, most of the important work was assigned to the other assistants. *E.g., id.* at 4–5, 12.

4. Rodriguez did not join in the recommendation to settle Vega's claim because the Secretary told her "this was a personal matter." *Id.* at 5, 13.

As I read the record, it seems very clear that the district court's reliance on at least three of the four enumerated factors was misplaced. This leads me to the next, logical, more sweeping conclusion: the court's finding of a politically inspired dismissal was clearly erroneous. To be sure, circumstantial evidence may be used to create an inference of discriminatory motive—yet the inference must flow rationally from such facts as are available. Where, as here, the circumstantial evidence is fragile at best, speculation—though inferential in nature—does not rise to the level of proof. *See Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 n. 25, 99 S.Ct. 2282, 2296 n. 25, 60 L.Ed.2d 870 (1979). Because the case is *sui generis*, I must write at some length to explain my position.

Although the record references are sparse and I can find no direct evidence contradicting the Secretary's testimony that she was unaware of plaintiff's PNP affiliation when she ordered the transfer, I assume *arguendo* that such knowledge was properly inferable. Moreover, I do not question that knowledge of an employee's political preference is a datum relevant to a showing of politically-motivated discrimination. But that abstraction must be reified in the evidentiary cauldron of a given case. The mere fact that an employer and an employee belong to opposing political parties, and are aware of it, does not by itself provide an adequate basis for inferring the existence of political discrimination. *See Nekolny v. Painter*, 653 F.2d 1164, 1168 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139 (1982). Not every Republican who fires, demotes, or reassigns a Democrat acts out of political animus.

The second piece of evidence concerned the Secretary's ostensible "failure" to transfer Estrada into another superintendency in a different region after Vega's return. As I parse the key passage of the departmental regulations, Article 9.2, § 1(a), quoted *ante* at 16, it proves very little. Admittedly, the language raises the possibility that the Secretary could perhaps have transferred plaintiff to another superintendency—even this is unclear, as the enumeration of illustrative "special needs" strongly suggests to me that the need must be systemic, not merely conveniently conciliatory—but that is hardly the point. There is certainly nothing in the language which *required* the Secretary to transfer the plaintiff laterally, or which allowed her to transfer credits toward tenure across municipal lines in what I perceive would be outright violation of the Permanency Act. *See* P.R. Laws Ann. tit. 18, § 214.[2]

There are other, equally cogent, reasons why the "failure" to shift Estrada to a vacant superintendency elsewhere cannot be considered evidence of discrimination. As the majority concedes, it was Caballero—the chief of personnel and herself an attorney—who, "on her own accord," *id.* at 5, determined that under the Permanency

---

**2.** That Alvira, a former school superintendent, had been transferred, *see ante* at 13, proves nothing. Unlike Estrada, Alvira had achieved permanency before any transfer occurred. Moreover, he was not transferred *into another municipality,* but to a central office administrative post. Thus, the Permanency Act may not have been implicated in Alvira's case. Be that as it may, it would be sorely trammelled by the majority's hypothetical Lajas–for–Maricao swap.

Act "any settlement would have to involve the Maricao position and no other." *Id.* at 6. What my colleagues refer to as "Aponte's 'no transfer' policy," *id.* at 13, was formulated independently by Caballero. Aponte, new to the Secretary's post, did no more than approve her subordinate's recommendation. Caballero is not a defendant. There is not a scintilla of evidence which casts doubt upon her motives. Likewise, the record is barren of proof which calls into legitimate question appellant's entitlement to rely upon Caballero's interpretation or her good faith in doing so. The record, I suggest, makes it plain that appellant reasonably relied upon Caballero to investigate both the wisdom of settling the *Cabiya* case and the mechanics of resolving any attendant problems.[3]

I find it significant, too, that Estrada, by her own admission, never requested a lateral transfer. The Secretary cannot be expected to be a mind reader. If in fact the regulations permitted the accommodation of an employee's job preference in this manner—and I do not think that they do—the employee has some obligation to trigger the mechanism by making a request. Appellee argues that she had no opportunity to request relocation because she only learned of the *Cabiya* decree when she received a letter signifying her removal and reassignment to the auxiliary superintendent's position. My brothers appear to accept this as a full explanation. *See ante* at 17. But a day later Estrada wrote to appellant protesting her ouster, without mentioning a willingness to accept a superintendency in another region or suggesting such an alternative. Nor did she ask, directly or by fair implication, for such a transfer during the weeks that followed.

For all of these reasons, the district court was clearly wrong in treating the Secretary's "failure" to reassign plaintiff elsewhere as evidencing discriminatory intent.

The district court's third focus concerned evidence which indicated that, after Vega was restored to the superintendency, "the work of the assistant superintendents in the school district of Maricao was mostly assigned to the two other assistant superintendents.... [and] plaintiff was also ordered to substitute a school principal in an isolated rural area who was on vacation when, at the same time, there was a vacancy as a director in an urban school and nobody was sent there." Slip op. at 12. Unlike the majority, I am at a loss to see how these facts evidence discrimination. Transferring the vacant assistant superintendent's slot to Maricao seems a reasonable effort to accommodate plaintiff after Vega replaced her. Since two assistant superintendents were already in place, it is not surprising that the newcomer on the block was given fewer responsibilities when she started. Nor was there evidence to suggest that the stint as a substitute principal was a particularly onerous one, that it was out of the ordinary for an assistant superintendent to pinch-hit for a vacationing principal, or that Estrada ever asked to substitute for the school director instead. It is, in my view, chancy business for the courts to attempt to nitpick such interstitial administrative decisions.

Moreover, plaintiff's quondam work assignments were never casually linked to any actions *of the defendant.* Generally speaking, there is no *respondeat superior* liability in a section 1983 action. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 453, 70 L.Ed.2d 509 (1981); *Guzman v. City of Cranston,* 812 F.2d 24, 26 (1st Cir.1987). *Chongris v. Board of Appeals,* 811 F.2d 36, 39 n. 5 (1st Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987). In this instance, no evidence was presented indicating that the

---

**3.** My brethren lay great weight on the fact that Vega, in the course of settlement negotiations, expressed a willingness to accept the superintendency in Lajas instead of Maricao. *E.g., ante* at 15–16. The terms of this "offer" are not contained in the record. In any event, Caballero decided to ply a different course. I can find no evidence to indicate either that (a) Aponte can be blamed for accepting the advice of her legal staff, or (b) Vega would have accepted the Lajas post without guaranteed permanency (an assurance which, as I read the Permanency Act, could not be given). On the record as it stands, the refusal to compromise with Vega on the basis of an assignment in Lajas was not evidence of the Secretary's discriminatory intent.

Secretary either knew the details of plaintiff's work situation following her demotion or approved—let alone dictated—the particular features of the work environment. There was no evidence that Estrada complained to appellant about the details of her assignments, that her immediate superiors discussed those assignments with appellant, or that appellant was on actual notice of them. The Secretary heads a department employing over seventy thousand individuals. It strains credulity to assume, on this exiguous record, that she was responsible for plaintiff's diminished work load or monotonous day-to-day assignments. In the absence of the necessary linkage with the defendant, I believe that the district court erred in treating the events which transpired after Estrada's transfer as evidence of this defendant's improper motive. With respect, the majority perpetuates this error.

The fourth piece of evidence was that the Secretary settled the *Cabiya* case despite the fact that the Department's general counsel "had not recommended a settlement ... because the Secretary had told her that this was a personal matter." Slip op. at 13. The majority concedes that this must be ignored because it was an "auditory mixup," *ante* at 17, wherein the court below misunderstood the testimony. The dysphemism being acknowledged, I need not dwell upon it. There was simply no basis for concluding that any recommendation was withheld due to the Secretary's "personal" interest.

In fine, none of the four legs of the contraption which the district court constructed to underbrace its holding can bear the assigned weight. Nor do my colleagues, despite heroic efforts, succeed in shoring up the apparatus. The reliance upon the timing of events, *ante* at 15, is mislaid. It is not as if defendant, immediately upon taking office, initiated discussions aimed at sacking Estrada. Rather, it was a Justice Department lawyer, Irene Reyes—a person whose politics remain unknown—who started the ball rolling by sending word that a trial date had been set in *Cabiya* and that the presiding justice, Judge Lopez, was pressing the parties to settle. Nor does the sweeping statement that "there were, at least theoretically, many conceivable ways to settle [Vega's] case," *ante* at 14, add measurably to the equation. The question is whether the chosen way, *based on the trial record*, necessarily evidenced a discriminatory animus.

All in all, once the impermissible conclusions drawn by the district court have been sifted out, the essentially uncontradicted facts which remain show, at most, that Vega staked his claim to the superintendency long before the PPD came to power. His suit for reinstatement was open—pending—when Estrada became superintendent. The Education Department did not invent the suit. It could not reasonably be expected to ignore either the imminence of trial or Judge Lopez's prodding towards settlement. Once *Cabiya* loomed on the horizon, settlement was originally advocated *ab extra*—not by the Secretary or her subalterns, but by the superior court judge and two different DOJ attorneys, first Reyes and later Algarin (her superior). No one suggests that Judge Lopez was less than scrupulously impartial or that either of the DOJ lawyers knew of plaintiff's existence—never mind her political preference. And the record seems uncontradicted that Vega's case was likely meritorious.

When the idea of settlement was broached, Caballero was asked to evaluate it. After looking into the matter, she favored a compromise and reported as much to the Secretary. The Secretary then authorized settlement *along the lines structured by the attorneys associated with the litigation*. Afterwards, the parties' agreement was embodied in a decree and presented to the judge, who entered it.

Putting surmise to one side, this chain of circumstances admits of but a single reasoned conclusion. Even if one assumes the worst about the Secretary's intentions—and I do not suggest that there is any record-rooted cause for such a drastic assumption—there were too many other cooks stirring the broth. In the absence of any evidence of collusion or discriminatory intent on the part of people such as Algarin, Reyes, Caballero, or Judge Lopez,

there can be no basis adequate to support a conclusion that the settlement was merely an ejectory vehicle for unseating plaintiff.

### B.

All of this being so, there is yet another reason why the decision below must be reversed and why Estrada's reinstatement cannot be ordered: the district court, in a very real sense, was barred by the imperatives of full faith and credit, 28 U.S.C. § 1738, from making "any inquiry into the merits of the cause of action, the logic or consistency of the decision, or the validity of the legal principles on which the judgment (was) based...." *Bergeron v. Estate of Loeb,* 777 F.2d 792, 796 (1st Cir. 1985), *cert denied,* 475 U.S. 1109, 106 S.Ct. 1517, 89 L.Ed.2d 915 (1986) (quoting *Milliken v. Meyer,* 311 U.S. 457, 462, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)). Because the reinstatement order flies squarely in the face of the *Cabiya* decree, it cannot stand.

I begin by noting that, not only was the Secretary obligated to abide by the judgment of the Puerto Rico Superior Court, but the federal district court was bound to accord that judgment full faith and credit—and so are we. *See Medina v. Chase Manhattan Bank, N.A.,* 737 F.2d 140, 142 (1st Cir.1984) (federal courts "must give full faith and credit to the judgments of the courts of Puerto Rico"). Nothing in the record, fairly viewed, suggests that the *Cabiya* judgment was subject to any disqualifying infirmity: there was, for example, no showing of fraud, collusion, or want of jurisdiction. It is immaterial that the decree was entered by submission; consent decrees, like other forms of judgments, are not generally subject to collateral attack. *See Marino v. Ortiz,* 806 F.2d 1144, 1146 (2d Cir.1986), *cert. granted,* —— U.S. ——, 107 S.Ct. 2177, 95 L.Ed.2d 833 (1987); *Dennison v. Los Angeles Dep't of Water and Power,* 658 F.2d 694, 695 (9th Cir.1981); *Culbreath v. Dukakis,* 630 F.2d 15, 22 (1st Cir.1980). It is equally immaterial that Estrada was not a party to the original litigation. The *Cabiya* case was a matter of public record, antedated her assumption of the Maricao superintendency, and laid direct claim to the office. She could have attempted to intervene in that case, but did not. She cannot now ask a federal court to subvert the commonwealth court's judgment by indirection. *Marino,* 806 F.2d at 1146–47; *Black and White Children of the Pontiac School System v. School District,* 464 F.2d 1030 (6th Cir.1972) (per curiam). Federal power to effect collateral revision of the decree in such a high-handed fashion is lacking.

In general terms, section 1738 requires federal courts to give a judgment of a Puerto Rico court "the same preclusive effect" that the judgment would receive in the Commonwealth's judicial system. *Arecibo Radio Corp. v. Commonwealth,* 825 F.2d 589, 591–92 (1st Cir.1987). It has not been seriously suggested that, on a motion or in a proceeding prosecuted on Vega's behalf, the courts of Puerto Rico would not enforce the *Cabiya* decree against the Secretary according to its literal terms and tenor. Whether or not Estrada, a nonparty, was bound by the judgment in Vega's case, *appellant* was bound. Being bound, she was legally compelled to obey the reinstatement order. It is this effect which, in my opinion, deserves full faith and credit.

From and after entry of the *Cabiya* decree, the Secretary was constrained by it, that is, *she had no lawful choice but to reinstate Vega.* She was duty bound to honor the judgment, thereby making way for Vega's return. And in this instance, two was a crowd: Vega could only be reinstated by removing Estrada. Appellant cannot be subjected to liability under section 1983 merely because she bowed to the judgment of a court of competent jurisdiction. *Cf. Dennison,* 658 F.2d at 695–96 (employer not liable to nonminority employees for benefits accorded to minority employees under "affirmative action" type consent decree entered to settle class action discrimination suit; relief sought seen as "conflicting" with consent decree and therefore unattainable). Nor can Vega's rights under the superior court order be eliminated with so facile a stroke of the federal pen.

Under the majority's reasoning, full faith and credit cannot possibly be accorded to the final judgment of the Puerto Rico Superior Court in *Cabiya:* placing Estrada back into the job necessitates ousting Vega from it, that is to say, the district court's remedy—which the majority now affirms—*requires* the Secretary to disobey Judge Lopez's decree. My brethren offer scant support for plowing under the consent decree, thereby intruding on the sovereignty of the Commonwealth. The lone case advanced by the majority on this point, *F.S.E. v. J.R.T.*, 111 D.P.R. 505 (1981), cited *ante* at 19 n. 9, is completely inapposite. *F.S.E.* has nothing to do with either full faith and credit or with res judicata; the case concerns only the lack of binding effect possessed by an arbitration award emanating from procedures which transgress the stipulations of the applicable collective bargaining agreement. The relevance of *F.S.E.* in the present context, frankly, escapes me. By accepting the district judge's *ipse dixit*—the bald statement that the commonwealth courts would not respect the *Cabiya* judgment—the majority perpetuates the error of the court below. With all due respect, it is difficult for me to see how a legal theory which (i) flouts full faith and credit, (ii) depends upon an analysis so meagre that even my colleagues term it "cursory," *ante* at 18, and (iii) has no discernible roots in Puerto Rico law, can be thought deserving of categorization as a "reasonable construction of state law." Rather, I continue to subscribe to the noti that "[a] final judgment does not lose its ... effect simply because another court might consider the decision erroneous." *Medina*, 737 F.2d at 143. The district court was, I believe, powerless to extinguish the superior court order.