USCA1 Opinion

 

 _________________________
No. 91-1712 JANE ANTHONY, ET AL., Plaintiffs, Appellees, v. BRUCE G. SUNDLUN, ET AL., Defendants, Appellants. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Francis J. Boyle, U.S. District Judge] _________________________ Before Selya, Circuit Judge, Bownes, Senior Circuit Judge, and Cyr, Circuit Judge. _________________________ Casby Harrison, III, Associate Executive Counsel, Office of
the Governor, for appellants Sundlun and Cruise. Richard B. Woolley, Assistant Attorney General, State of Rhode
Island, for remaining appellants. Arthur M. Read, II, with whom Gorham & Gorham, Inc. was on
brief for appellees. _________________________ _________________________ SELYA, Circuit Judge. The defendants, state officials,
adamant in their refusal to recognize that discriminatory animus
can be proven circumstantially as well as by direct evidence,
appeal from an order suspending the operation of termination
notices addressed to the plaintiffs, seven seasonal state
employees. We affirm. The circumstances of the case can be succinctly
summarized. 1. In November 1990, Rhode Island's incumbent governor,
a Republican, was defeated at the polls. His successor, Bruce
Sundlun, is a Democrat. Governor Sundlun took office on January 1,
1991. 2. Because parimutuel wagering is permitted at the
privately-owned jai alai fronton in Newport, Rhode Island, pursuant
to a state license, state employees are assigned to work there. The fronton is open on a seasonal basis. The 1991 jai alai season
began on May 2, 1991. 3. Toward the end of April, 1991, the state hired ten
persons, including the seven plaintiffs, to fill various non-
policymaking positions (e.g., parimutuel monitors, auditors, etc.)
based at the fronton. All seven plaintiffs had worked there
without incident during the previous season. All were Republicans. 4. On April 26, the governor's chief of staff, R. David
Cruise (himself a Democratic state senator), demanded that the
hiring agency (the Division of Racing and Athletics of the state's
Department of Business Regulation) furnish him a roster of
positions at the fronton. The list was delivered the same day. It
enumerated thirteen positions and contained an explicit statement
that: "All but three (3) of the positions listed above are
currently filled." The three vacant positions were specified. 5. Senator Cruise, who testified that he read the list
but not the explanatory statement, immediately consulted a
Democratic general officer and a prominent Democratic state
representative concerning potential appointees. On May 1, 1991,
the chief of staff transmitted thirteen names to the hiring agency,
denominating the job that each person was to perform at the
fronton. The plaintiffs' positions were encompassed. Twelve of
the newcomers were Democrats. The thirteenth, registered as an
"unaffiliated" voter, was Cruise's close personal friend. 6. The plaintiffs were cashiered the next day, just as
the jai alai season opened. On these, and other, facts, the district court concluded
that, apart from political spoils, it would be "difficult if not
impossible to find any other rational explanation [for the
firings]." Applying the familiar four-part test for ascertaining
whether a preliminary injunction should be granted, see, e.g.,
Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir.
1991), the court determined that interim relief was warranted. It thereupon issued a restraining order which had the effect,
pending a trial on the merits, of reinstating the sacked plaintiffs
to the jobs that had been snatched away from them so
unceremoniously. This appeal followed. We linger little over the appellants' importunings. The
parties agree that partisan political affiliation was not a
legitimate requirement for the due performance of any of the
affected jobs; and that, therefore, under principles elucidated by
the Supreme Court, the plaintiffs were protected against patronage
dismissals by a clearly established First Amendment right. See
Rutan v. Republican Party of Ill., 110 S. Ct. 2729, 2737 (1990);
Branti v. Finkel, 445 U.S. 507, 517-18 (1980); Elrod v. Burns, 427
U.S. 347, 367-68 (1976). The only question, then, is whether the
district court erred in concluding that the plaintiffs were likely
to succeed on the claim that their discharges were politically
motivated. Refined to bare essence, the appellants' argument seems
to be that political favoritism must be proved by direct evidence. We disagree. Victims of heavy-handed uses of the spoils system are
not limited to redress in only those (relatively rare) instances in
which a "smoking gun" can be produced. To the exact contrary, we
have held, time and again, that circumstantial evidence alone can
support a finding of political discrimination. See, e.g., Estrada-
Izquierdo v. Aponte-Roque, 850 F.2d 10, 14-15 (1st Cir. 1988);
Kercado-Melendez v. Aponte-Roque, 829 F.2d 255, 264 (1st Cir.
1987), cert. denied, 486 U.S. 1044 (1988); Rosaly v. Ignacio, 593
F.2d 145, 149 (1st Cir. 1979). Circumstantial evidence is often
particularly helpful when, as here, a case turns on a protean issue
such as an actor's motive or intent. As the Court wrote in a
closely analogous context almost half a century ago: [W]hile objective facts may be proved directly, the state of a man's mind must be inferred from the things he says or does. . . . [C]ourts and juries every day pass upon knowledge, belief and intent þ the state of men's minds þ having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred.
American Communications Ass'n v. Douds, 339 U.S. 382, 411 (1950). The test, then, as applied to the plaintiffs' dismissals, reduces
to a question of persuasiveness: does the circumstantial evidence,
taken as a whole, give rise to a plausible inference of
discriminatory animus which, ultimately, possesses enough
convictive force to persuade a rational factfinder that the
defendants' conduct was politically motivated? In the case at bar, the circumstantial evidence is
damning and, consequently, the inference of discrimination is
virtually inescapable. To start with, all the plaintiffs were
registered Republicans. By and large, they were replaced by
Democrats. As the defendants asseverate, these raw numbers alone
are likely insufficient to ground a finding of patronage dismissal. See Estrada-Izquierdo, 850 F.2d at 15. But, there was much more. The timing itself was suggestive: the transmogrification
occurred on the heels of a major shift in political power. The
evidence showed beyond peradventure that the plaintiffs were
qualified for their jobs; indeed, they had performed the same work
satisfactorily during the preceding season. They were discharged
within a week after they were rehired. To this date, the
defendants have not articulated a legitimate reason for the mass
firings. Moreover, the dismissals occurred after the governor's
chief of staff had inquired specifically about the jobs and had
conferred privately with two party leaders. To be sure, Cruise testified that he had no partisan
motives. But, what an actor says is not conclusive on a state-of-
mind issue. Notwithstanding a person's disclaimers, a contrary
state of mind may be inferred from what he does and from a factual
mosaic tending to show that he really meant to accomplish that
which he professes not to have intended. On this pregnant record,
the district judge acted well within his province in refusing to
credit Cruise's claim of wounded innocence. Trial judges, after
all, are not required to ignore that which is perfectly obvious or
to take a witness' word for his state of mind, no matter how
strongly the circumstances point in a different direction. And we,
in turn, ought not to disturb supportable findings, based on
witness credibility, made by a trial judge who has seen and heard
the witnesses at first hand. See Anderson v. City of Bessemer
City, 470 U.S. 564, 575 (1985); Deguio v. United States, 920 F.2d
103, 106 (1st Cir. 1990). The defendants also argue that, because the evidence
fails to show that Senator Cruise knew the plaintiffs or was
explicitly aware of the plaintiffs' efforts on behalf of Republican
causes, the plaintiffs are unlikely to succeed at trial. This
argument is sheer sophistry. Given the nature of the positions,
the defendants' knowledge that the plaintiffs had originally been
hired by the previous (Republican) administration, the timing of
the moves, the identities of those consulted, the lack of any
legitimate reason for ousting the incumbents, and the partisan
connections of the replacement workers, it seems disingenuous to
suggest that Cruise acted without regard to the politics of the
situation. We do not think that liability in a political
discrimination case involving non-policymaking positions
necessarily depends on a finding that the defendants knew to a
certainty that the ousted jobholders were members of the opposition
party. Cf., e.g., Matlock v. Barnes, 932 F.2d 658 (7th Cir.)
(demotion of non-policymaking municipal employee held to be
impermissible act of political reprisal; demoting official and
demoted employee belonged to same political party, but employee had
supported losing candidate in party primary), cert. denied, 112 S.
Ct. 304 (1991). We need go no further. The district court, on the basis
of an impressive array of circumstantial proof, determined that the
plaintiffs were likely to succeed in this political discrimination
suit. At the same time, the court determined that the other
factors conducive to the issuance of a preliminary injunction were
present. Those findings pass muster on three salient levels: as
a matter of law; as a matter of evidentiary sufficiency; and as a
matter of common sense. The restraining order that ensued was an
appropriate exercise of the court's discretion.
Affirmed.