UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 92-1846
FRANCO ACEVEDO-DIAZ, ET AL.,

Plaintiffs, Appellees,

v.

JOSE E. APONTE, ET AL.,

Defendants, Appellees,



ADA N. PEREZ, ET AL.,

Plaintiffs, Appellants.



No. 92-1848
FRANCO ACEVEDO-DIAZ, ET AL.,

Plaintiffs, Appellees,

v.

JOSE E. APONTE, ET AL.,

Defendants, Appellees,



DOROTEA COLLAZO RIVERA, ET AL.,

Plaintiffs, Appellants.



APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO,

[Hon. Raymond L. Acosta, U.S. District Judge]




Before

Selya, Cyr and Stahl,

Circuit Judges.




Raul Barrera Morales for appellants.

William Reyes Elias with whom Cesar R. Miranda Law Office

was on brief for appellees.



August 3, 1993


2

CYR, Circuit Judge. In November 1984, Jose E. Aponte,
CYR, Circuit Judge.


the candidate of the Popular Democratic Party ("PDP"), was

elected mayor of the Municipality of Carolina ("City"), Puerto

Rico, defeating the incumbent mayor, Roberto Iglesias, the

candidate of the New Progressive Party ("NPP"). During his first

year in office, Mayor Aponte either terminated, or refused to

renew, several hundred non-policymaking city employees hired

under the previous administration. In letters of dismissal to

the employees, Aponte claimed that the City faced a severe fiscal

crisis, and disclosed various criteria for determining which

municipal employees were to be terminated in order to effect the

necessary economies:

(1) employees hired without compliance with
Commonwealth or municipal personnel laws
and regulations, see, e.g., P.R. Laws

Ann. tit. 3, 1331-1337, which dictate
the public posting of available posi-
tions and competitive examinations;

(2) employees hired or promoted during the
1984 "veda," or "electoral prohibition
period," a four-month "window" before
and after a municipal election during
which hiring, renewals, or promotions by
the incumbent administration are pro-
scribed by law;

(3) employees who submitted no documentary
proof that they possessed the minimum
education and experience required for
their positions; 

(4) employees whose job positions were
deemed nonessential, and therefore ex-
pendable; or

3

(5) employees who had committed employment
infractions (e.g., unexcused leaves of

absence, chronic tardiness).

In March 1986, 357 terminated employees, claiming poli-

tical affiliation with the ousted NPP, brought the present civil

rights action under 42 U.S.C. 1983 against the City, Mayor

Aponte, Jose A. del Valle (at times, the acting mayor), and Felix

Martinez (the personnel officer). Plaintiffs alleged that their

dismissals were due solely to their NPP affiliation, in violation

of their First Amendment and due process rights under the United

States Constitution. The complaint demanded compensatory and

punitive damages, as well as reinstatement.1

The claims of 255 plaintiffs went to the jury following

a four-month trial, and defendant verdicts were returned on the

claims of 240 plaintiffs. Six plaintiffs were awarded compen-

satory damages (from $1700 to $10,440) against the City, and

punitive damages ($25,000) against Aponte, while nine plaintiffs



1Three municipal employee classifications were involved in
the challenged terminations: (1) "regular" employees, occupying
permanent or career municipal positions, (2) "transitory"
employees, appointed without the usual personnel screening
procedures (e.g., postings and competitive examinations), but

subject to periodic renewals at the expiration of their fixed
terms, and (3) "contractual" workers, hired for fixed terms under
federally funded programs (e.g., HUD) administered by the City.

"Transitory" employees lack tenure, or a reasonable expectation
in the indefinite continuation of their employment after the
expiration of their fixed term. While their lack of a property
interest in their employment positions generally precludes due
process claims for a politically discriminatory dismissal, First
Amendment discrimination claims are not precluded. See Santiago-

Negron v. Castro-Davila, 865 F.2d 431, 436 (1st Cir. 1989);

Estrada-Izquierdo v. Aponte-Roque, 850 F.2d 10, 16 (1st Cir.

1988).

4

were awarded nominal damages ($1.00) against the City,2 and

punitive damages ($25,000) against Aponte. The district court

denied all claims for reinstatement. Finally, in May 1992, the

court set aside all fifteen plaintiff verdicts. The present

appeal is brought by eleven of the fifteen disappointed plain-

tiffs.

DISCUSSION


A. Standard of Review and Applicable Law


A jury verdict may not be set aside as a matter of law

under Fed. R. Civ. P. 50(b) except on a "'determination that the

evidence could lead a reasonable person to only one conclusion.'"


Hiraldo-Cancel v. Aponte, 925 F.2d 10, 12 n.2 (1st Cir.) (quoting


Conway v. Electro Switch Corp., 825 F.2d 593, 598 (1st Cir.


1987)) (emphasis added), cert. denied, 112 S. Ct. 637 (1991); see


Ferrer v. Zayas, 914 F.2d 309, 311 (1st Cir. 1990). On de novo


review, the court of appeals will uphold the verdict unless the

facts and inferences, viewed in the light most favorable to the

verdict, "point so strongly and overwhelmingly in favor of the

movant that a reasonable jury could not have [returned the ver-

dict]." Hendricks & Assocs., Inc. v. Daewoo Corp., 923 F.2d 209,


214 (1st Cir. 1991); Ferrer, 914 F.2d at 311; Mayo v. Schooner


Capital Corp., 825 F.2d 566, 568 (1st Cir. 1987). 




2On appeal, certain plaintiffs demand a new trial on compen-
satory damages, arguing that the jury had no choice but to credit
their testimony on damages, especially as it related to their
mental suffering and anguish. We summarily reject their argu-
ment, as wholly unsupported by the record.

5

In a political discrimination case, see Branti v.


Finkel, 445 U.S. 507 (1980); Elrod v. Burns, 427 U.S. 347 (1976),


plaintiffs must bear the threshold burden of producing sufficient

direct or circumstantial evidence from which a jury reasonably

may infer that plaintiffs' constitutionally protected conduct 

in this case, political affiliation with the NPP was a "sub-

stantial" or "motivating" factor behind their dismissal.3 See


Ferrer, 914 F.2d at 311; Estrada-Izquierdo v. Aponte-Roque, 850


F.2d 10, 13 (1st Cir. 1988); Rosaly v. Ignacio, 593 F.2d 145,


148-49 (1st Cir. 1979). Once plaintiffs clear the threshold, the

burden shifts to defendants to articulate a nondiscriminatory


ground for the dismissals, and prove by a preponderance of the


evidence that plaintiffs would have been dismissed regardless of


their political affiliation. See Givhan v. Western Line Consol.


Sch. Dist., 439 U.S. 410, 416 (1979); Rodriguez-Pinto v. Tirado-


Delgado, 982 F.2d 34, 39 (1st Cir. 1993); Kercado-Melendez v.


Aponte-Roque, 829 F.2d 255, 264 (1st Cir. 1987), cert. denied,


486 U.S. 1044 (1988). Either this "but for" causation test, or

the defendant-employer's "Mt. Healthy defense," ensures that a


plaintiff-employee who would have been dismissed in any event on

legitimate grounds is not placed in a better position merely by

virtue of the exercise of a constitutional right irrelevant to

the adverse employment action. See Mt. Healthy City Sch. Dist.




3The defendants do not contend that any appellant held
either a confidential or a policymaking position for which
partisan political affiliation might have been a legitimate
requirement. See Branti, 445 U.S. at 508; Anthony v. Sundlun, 952

F.2d 603, 605 (1st Cir. 1991).

6

Bd. of Educ. v. Doyle, 429 U.S. 274, 284 (1977); Acosta-Sepulveda


v. Hernandez-Purcell, 889 F.2d 9, 13 (1st Cir. 1989); Rosaly, 593


F.2d at 148.

After a careful summarization of the trial evidence,

the district court granted defendants' Rule 50(b) motion for

judgment as a matter of law because the bulk of the circumstan-

tial evidence relied on by plaintiffs namely, their party

affiliation and the temporal proximity between their dismissals

and Mayor Aponte's inauguration was too conjectural and

conclusory to counteract the "overwhelming" Mt. Healthy defense,


which demonstrated that massive layoffs were compelled as a

result of the severe fiscal crisis brought on by the overhiring

of City personnel under the previous administration. See Kauff-


man v. Puerto Rico Tel. Co., 841 F.2d 1169, 1172 (1st Cir. 1988)


(finding that plaintiffs failed to allege the type of specific


evidence of politically discriminatory animus required to avoid

summary judgment).

The district court opinion compares the Mt. Healthy


burden-shifting mechanism to similar devices used in other

employment discrimination cases, such as Title VII cases, see,


e.g., Chamberlin v. 101 Realty, Inc., 915 F.2d 777, 782 (1st Cir.


1990), and ADEA cases, see, e.g., Goldman v. First Nat'l Bank,


985 F.2d 1113, 1116-18 (1st Cir. 1993). The opinion states that,

once the defendant interposes the Mt. Healthy defense, "the


plaintiff then has the opportunity to demonstrate that the

alleged nondiscriminatory reason is a false pretext," which may

7

be accomplished either by "'persuading the [jury] that a discrim-

inatory reason more likely motivated the employer or indirectly

by showing that [the] employer's proffered explanation is

unworthy of credence.'" Dist. Ct. Op., at 4 (quoting Texas Dep't


of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981) (Title


VII case)). Although literally correct, the quoted statement

gives us pause, especially in light of the citation to Burdine.


Since a proper allocation of the burden of persuasion is critical

to our assessment of the district court's decision under Rule

50(b), we first revisit the applicable burden-shifting procedure.

Under Title VII, a plaintiff must establish a prima


facie case of employment discrimination, at which point a pre-


sumption of discrimination attaches to the plaintiff's claim. A

limited burden of production then passes to the employer to ar-


ticulate a legitimate, nondiscriminatory reason for its actions,


a burden which is fully satisfied if the employer submits enough

evidence to raise a genuine issue of material fact. The employer

need not submit sufficient evidence to "persuade the [fact

finder]." Burdine, 450 U.S. at 254. In other words, notwith-


standing the interim shift in the burden of production to the

employer, the plaintiff-employee in a Title VII case "retains the

burden of persuasion" at all times. Id.


By contrast, under the Mt. Healthy burden-shifting


mechanism applicable to a First Amendment political discrimina-

tion claim, the burden of persuasion itself passes to the defen-


dant-employer once the plaintiff produces sufficient evidence


8

from which the fact finder reasonably can infer that the plain-

tiff's protected conduct was a "substantial" or "motivating"


factor behind her dismissal. Accordingly, once the burden of

persuasion shifts to the defendant-employer, the plaintiff-

employee will prevail unless the fact finder concludes that the

defendant has produced enough evidence to establish that the

plaintiff's dismissal would have occurred in any event for

nondiscriminatory reasons.

Therefore, we can sustain a Rule 50(b) reversal in a

political discrimination case only if: (1) the record evidence

compelled the conclusion that the plaintiff would have been dis-


missed in any event for nondiscriminatory reasons, or (2) the

plaintiff did not introduce sufficient evidence in the first

instance to shift the burden of persuasion to the defendants. We

address these alternatives in turn.

B. The "Austerity" Defense


Through numerous expert witnesses and statistical

data,4 defendants attempted to establish that all the chal-



4For example, defendants presented the following uncon-
troverted evidence: 1) in 1985, there were approximately 2,900
City employees, including 906 "transitory" employees, 459 of whom
had been appointed by the former administration in fiscal year
1984 alone; 2) the former mayor had made 250-300 appointments
between July and October 1984; 3) in 1984, despite warnings about
the City's worsening budgetary problems, the former mayor renewed
all transitory employees' expiring appointments; 4) by 1985, the

personnel payroll comprised 80% of the City's budget; 5) in 1985,
defendant Aponte inherited a debt of $116 million, which has
since been reduced to $30 million, and an accumulated deficit of
$30 million, since reduced to $3 million; and 6) by 1991, there
were 1,966 City employees, only eight of whom were "transitory"
employees. 

9

lenged dismissals were due to the fiscal crisis inherited by

Mayor Aponte when he took office in 1985, which the defendants

attributed to mismanagement or illegal patronage hiring practices

on the part of the previous administration. The jury reasonably

could have found that the dismissals made by the incoming admin-

istration resulted in a 32% net reduction of approximately 900

City employees (from 2,869 to 1,966), and that no new employees

were hired to perform the duties of the dismissed plaintiffs.

Thus, the jury reasonably could have concluded that a bona fide

fiscal crisis would have compelled the vast majority of the

challenged dismissals even if the targeted employees had not been

affiliated with the NPP. Defendants' well-deployed

"austerity" defense apparently thwarted the claims of 240 of the

255 plaintiffs whose cases went to the jury. But blunt instru-

ments make crude scalpels, and the Mt. Healthy defense requires


individualized scrutiny by the jury with a view to whether a

particular plaintiff's position would have been eliminated under

Aponte's austerity program but for the plaintiff's NPP affilia-


tion. In other words, even though defendants' overarching

austerity defense may have established that massive dismissals

were imperative, it did not compel jury verdicts adverse to all


plaintiffs. General statistical data regarding net work-force


reductions may mask individual dismissals which were purely dis-

criminatory. Here, some plaintiffs testified that their posi-

tions remained intact after their termination and specifically

identified their replacements; the jury was free to credit this

10

testimony, despite testimony to the contrary. See Veranda Beach


Club Ltd. Partnership v. Western Sur. Co., 936 F.2d 1364, 1385


(1st Cir. 1991) ("Once the threshold of sufficiency has been

crossed, the credibility of a claimant and its witnesses presents

a question for the jury, not for the trial court and most of

all, not for the court of appeals.").

Credibility determinations and evidence weighing are

not grist for the Rule 50(b) mill. Hendricks, 923 F.2d at 214.


As defendants were required to carry the burden of persuasion,


and the evidence supporting the Mt. Healthy "austerity" defense


did not compel jury acceptance of the claims of all 255 plain-

tiffs, we turn to the evidence bearing on the individual claims

of the eleven appellants.

C. The Individualized Defenses


The defendants attempted to establish their indivi-

dualized Mt. Healthy defenses at trial based largely on the con-


temporaneous justifications relied on in Mayor Aponte's letters

of dismissal. See supra p. 3. Under the Mt. Healthy burden-


shifting mechanism, the employer's contemporaneous justifications

for an adverse employment action serve at least two important

functions. First, to the extent the reasons given by the employ-

er at the time of the dismissal are later proven false or frivo-

lous, the weight of the evidence of discriminatory animus may be

enhanced, thereby contributing significantly to the threshold Mt.


Healthy showing the plaintiff-employee must make in order to


shift the ultimate burden of persuasion to the defendant-employ-

11

er. Second, once the burden of persuasion has shifted to the

employer, the jury would be entitled to find for the plaintiff-

employee were it to conclude that the employer did not offer

sufficient evidence to demonstrate that (i) the proffered reason

for the dismissal was genuine or (ii) a bona fide basis existed


which would have prompted the dismissal without regard to the

employee's political affiliation. We reserve these individual-

ized defenses for consideration with plaintiffs' evidence.

Leaving aside certain proffered justifications for

employee dismissals in the First Amendment political discrimina-

tion context,5 only two individualized defenses remain for our



5Some of the proffered justifications for defendants'
employment actions must be pared to accord with applicable law.
Although evidence that an employee was hired in violation of
Commonwealth law precludes a finding that the employee possessed
a property interest in continued employment, and hence a cogniza-
ble due process claim, Kauffman, 841 F.2d at 1173, evidence that

an employee's appointment was a "nullity" under Puerto Rico law
ab initio does not control a claim alleging a violation of the

employee's First Amendment right of political affiliation, see

Hiraldo-Cancel, 925 F.2d at 13 ("'We do not think that a new

administration can use the "nullity" of appointments doctrine as
a cover for discharges, transfers, and discrimination based
solely on political affiliation'") (quoting Santiago-Negron v.

Castro-Davila, 865 F.2d 431, 436-37 (1st Cir. 1989)). Although

defendants argue that the rationale of Santiago-Negron applies

only if the new administration continues to hire new personnel in

violation of the Personnel Act, Santiago-Negron rested on the

ground that state law does not and cannot define First Amendment

rights. Santiago-Negron, 865 F.2d at 436. We do not suggest,

however, that evidence relating to the plaintiff-employee's

qualifications under the applicable personnel regulations is
immaterial. For example, an employee's lack of qualifications
for the position, at the time of the dismissal, may well be

considered a nondiscriminatory basis for the dismissal. The jury
must determine whether such a lack of qualifications was a real
or pretextual justification for the dismissal. 
On analogous reasoning, we discount two variations on the
same defensive theme. First, the fact that some plaintiffs were
appointed or promoted during the "veda," the electoral prohibi-

12

consideration in the present case, based on the evidence relating

to each appellant's claim: (1) whether the plaintiff was quali-

fied for the position at the time of the dismissal, and (2), if

so, whether the position was eliminated for nondiscriminatory

reasons.

D. Plaintiffs' Evidence


Plaintiffs offered little direct evidence of discrimin-

atory animus. But see infra notes 6 & 8. Nevertheless, as we


have held, "circumstantial evidence alone can support a finding

of political discrimination." Anthony, 952 F.2d at 605; Estrada-


Izquierdo, 850 F.2d at 14. Certain general observations can be


made concerning the circumstantial evidence bearing on the claims

of all eleven plaintiffs. Mere temporal proximity between a

change of administration and a public employee's dismissal is

insufficient to establish discriminatory animus. Cf. Aviles-




tion period, is not necessarily controlling in the First Amend-
ment context. "Puerto Rico law is not controlling in the area of

first amendment law," Santiago-Negron, 865 F.2d at 436 (emphasis

added), and, in this respect, we see no principled distinction
between the Commonwealth's personnel and electoral laws. Second,
it is not necessarily a sufficient defense that a plaintiff did
not meet the legally mandated minimum qualifications for the
position at the time of appointment. See Hiraldo-Cancel, 925

F.2d at 13; Santiago-Negron, 865 F.2d at 436. Although, as a

general rule, an employee's continuing inability to meet the

established minimum qualifications for the position can be a
sufficient nondiscriminatory ground for dismissal, cf. Hiraldo-

Cancel, 925 F.2d at 14 (reinstatement is a meaningless remedy

where the employer, "under the aegis of valid personnel stan-
dards, is empowered to terminate reinstated employees as soon as
they dust off their desks"), Santiago-Negron's proscription

against post hoc "nullification" would suggest that, to be

controlling, the employee's qualifications should be measured as

of the challenged dismissal.


13

Martinez v. Monroig, 963 F.2d 2, 5 (1st Cir. 1992) (citing


Kauffman, 841 F.2d at 1172). On the other hand, we have noted


that the "highly charged political atmosphere" occasioned by the

major political shift from the NPP to the PDP throughout the

Commonwealth of Puerto Rico in 1984, coupled with the fact that

plaintiffs and defendants are of competing political persuasions,

may be probative of discriminatory animus. See Kercado-Melendez,


829 F.2d at 264; see also Anthony, 952 F.2d at 606 ("timing" of


dismissal may be suggestive of discriminatory animus); Estrada-


Izquierdo, 850 F.2d at 15 (same). Moreover, the record discloses


that these eleven appellants, for the most part, were not

quiescent NPP members but played very active or prominent roles

in its political activities, publicly and vocally supporting the

reelection campaign of the former mayor. See Nereida-Gonzalez v.


Tirado-Delgado, 990 F.2d 701, 706 (1st Cir. 1993) (noting evi-


dence that plaintiff was "known" party member); Ferrer, 914 F.2d


at 312 (noting that plaintiffs' political affiliation was not

only "well known" but, in some instances, notorious); Kercado-


Melendez, 829 F.2d at 264 (noting plaintiff's "long, active, and


visible membership" in the opposition party).

Appellants variously testified at trial that they were

(1) members of the former mayor's elite "advance team," a corps

of uniformed functionaries responsible for arranging campaign

appearances; (2) organizers or participants in pro-NPP political

rallies; (3) NPP women and youth coordinators; or (4) polling

unit officers or members of electoral colleges. Thus, the jury

14

reasonably could have concluded that those appellants who were

publicly identified as close political allies of the former NPP

mayor were more conspicuous targets for political discrimination.

Standing alone, even the circumstantial evidence that some plain-

tiffs were especially conspicuous targets for discriminatory

employment action by defendants would give us serious pause.

With but two exceptions, however, a careful review of the evi-

dence reveals that appellants plainly presented other evidence

sufficient to shift the burden of persuasion, effectively fore-

closing any realistic claim for Rule 50(b) relief by defendants.

We briefly recount the dispositive evidentiary considerations

bearing on each appellant's claim.

1. Brenda Aponte Osorio


Ms. Aponte was dismissed from her "regular" position,

as an Executive Officer IV, in May 1985. In addition to other

direct evidence of discriminatory animus,6 the letter of dismiss-

al from Mayor Aponte stated that Ms. Aponte apparently did not

possess the qualifications for her position in particular, a

college degree and "considerable" relevant work experience. In

fact, the written job description for an Executive Officer IV

lists a college degree as "desirable preparation," but provides

that a "combination of preparation and experience will be accept-

able"; it defines "experience" as "positions of progressive



6Ms. Aponte states that she was constructively dismissed one
day after the new administration took office, when she was denied
access to her office, told that she was "not a person of trust,"
and given no further duties. Her protests went unanswered.

15

responsibility . . . in the public service, including consider-

able administrative or supervision experience." (Emphasis


added.) At trial, Ms. Aponte testified that she attended college

for three years, and began working for the City in 1978 as a

supervisor in the Human Resources Department.7


Ms. Aponte presented sufficient evidence to enable a

jury to find that she possessed the required qualifications, both


at the time of her appointment and dismissal. The jury could

have concluded, therefore, that defendants' contemporaneous

justification was a mere pretext for political discrimination.

Cf. Aponte-Santiago v. Lopez-Rivera, 957 F.2d 40, 43 (1st Cir.


1992) (reversing summary judgment for defendant; noting that

proof that defendant's asserted nondiscriminatory reason for

dismissal was pretextual is a "link in a chain of circumstantial

evidence" of political discrimination which, when coupled with

allegedly "conclusory" evidence as to the timing of demotion and

the parties' political affiliation, creates a triable issue which

the fact finder might resolve in plaintiff's favor); Anthony, 952


F.2d at 606 (plaintiff's obvious qualifications can be circum-

stantial evidence of discriminatory animus); cf. also Burns v.


Gadsden State Community College, 908 F.2d 1512, 1519 (11th Cir.


1990) (employer's exceedingly narrow interpretation of minimum

"experience" required for position, coupled with other evidence



7Even though their individualized defenses, in many instanc-
es, succumbed to this same "equivalency" virus, permitting the
jury to make reasonable substitutions of work experience for
educational background, defendants have not challenged these
substitutions on appeal.

16

of discriminatory animus, creates genuine dispute as to whether

employer "invented" excuse as pretext to mask improper motive for

dismissal in ADEA action). The circumstantial evidence of

pretext, coupled with the direct evidence of discriminatory

animus, was sufficient to shift the burden of persuasion to

defendants. As there was no conclusive evidence that Ms. Aponte

would have been dismissed in any event for a nondiscriminatory

reason, the jury verdict must be sustained.

2. Dorotea Collazo Rivera


Ms. Collazo was dismissed from her "regular" position,

as an Administrative Assistant I, in January 1986.8 The dismiss-

al letter asserted that Collazo's termination was based on an

absence of evidence that she was ever qualified for her position.

However, Collazo's job description merely required a "desirable"

(high school diploma) education/experience ("general office

work") mix. Collazo testified that she met the posted academic

preparation component of the job description. Moreover, there

was no dispute that Collazo, who was appointed to her final


position with the City in 1981, previously had been employed as


an office clerk for the City since 1976. Thus, Collazo likewise


succeeded in shifting the burden of persuasion to the defendants,

and defendants simply failed to persuade the jury.



8When the new administration took over, Collazo's secretary
was transferred to another department and Collazo was locked out
of her office without warning. Collazo's husband, who was a NPP
unit chairman, and her daughter, were also dismissed from their
positions with the City in 1985-86.

17

3. Maria Colon de Jesus


Ms. Colon was dismissed from her "regular" position, as

a Messenger, in July 1985. The letter of dismissal stated that

the City's messenger service, with forty-two employees, was

"excessive and unnecessary," that it must be reduced to ten

employees as an economy measure, and that the ten employees to be

retained had been chosen based on an evaluation of their job

performance and seniority.

Ms. Colon conceded that the reduction in force did

occur as defendants indicated, and that she lacked the requisite

seniority to qualify for one of the ten remaining positions. She

points to no particular discriminatory conduct, nor does she

contend that (1) messengers with less seniority or lower perfor-

mance ratings were retained,9 (2) the City needed more than ten

messengers in 1985, or (3) defendants replaced any of the thirty-

two dismissed messengers. As Colon's political affiliation and

the timing of her dismissal were the only significant probative

evidence supporting her claim,10 and there was no direct or



9While conceding that she was among the dismissed messengers
with the least seniority, Colon nonetheless argues that the

selection criteria were suspect because Commonwealth law requires
that reductions in force be justified first on the basis of
employee performance ratings, and only then on seniority consid-
erations. See Delbrey v. Municipio de Carolina, 111 P.R.R. 492

(1984). The record indicates, however, that defendants made
their selections only after "considering the criteria of effi-

ciency in the performance of messenger duties and the time of

services rendered in that capacity." (Emphasis added.)

10In view of Colon's concession that she lacked the requi-
site seniority, the other circumstantial evidence was altogether
too weak to vault the initial Mt. Healthy hurdle. Colon's

political participation was much less frequent and activist than

18

circumstantial evidence of pretext, the burden of persuasion

never shifted to defendants. As no factual dispute was generated

concerning the legitimacy of the austerity measures, or Colon's

failure to meet the criteria for retention, the verdict could

only have been based on conjecture that Colon would not have been

terminated but for her political affiliation. See Ferrer, 914


F.2d at 311 ("plaintiff is not entitled to inferences based on

speculation and conjecture").11

4. Hector L. Encarnacion Matos


Encarnacion was dismissed from his "regular" position,

as a Computer Operator I, in August 1985. The dismissal letter

stated that he lacked the minimum qualifications for the posi-

tion, which defendants characterized at trial and on appeal as

requiring an "associate degree" in accounting or computer opera-



most other appellants. According to her undisputed testimony,
she merely participated "at the polling places, and on the
marches in [her] spare time," and served as "secretary for the
electoral board" in 1984.

11There are important public policy considerations at stake
in these circumstances. First, legitimate efforts by newly-
elected officials to impose fiscal constraints and to foster
operating efficiencies should not be hamstrung. See Marin-Piazza

v. Aponte-Roque, 873 F.2d 432, 434 (1st Cir. 1989) ("[W]e are

inclined to give a certain amount of leeway to personnel deci-
sions of new administration officials which implement a facially
politically neutral reorganization of structure or procedure.").
Newly-elected officials, however well meaning, might be deterred
from needed measures to effect economies and efficiencies in
governmental operations if a discharged employee's political
affiliation alone were enough to carry her claim to the jury.
Second, though there was ample opportunity to raise a genuine
factual dispute regarding the legitimacy of the defendants'
"austerity" program, the defendants demonstrated, without rebut-

tal, that the City has operated for at least six years with a

vastly streamlined messenger staff.

19

tion. The job description called for a "high school diploma,

supplemented by courses in mechanized accounting or programming

and one year of experience in that field," or "[a] combination of


academic background and experience." Thus, contrary to defen-

dants' mischaracterization at trial, the job description did not

require post-secondary school courses sufficient to qualify

Encarnacion for an associate degree. Moreover, although Encar-

nacion conceded at trial that his post-secondary school courses

were not in accounting or programming, and that he had no exper-

ience in computer programming prior to his appointment, he had


acquired two years' working experience on the job before he was

dismissed in 1985, during which time he had received several

"excellent" job performance evaluations. See id. at 312-13


(noting that jury could credit circumstantial evidence that

plaintiff "performed her duties very well"); Estrada-Izquierdo,


850 F.2d at 14 (finding "probative" the circumstantial evidence

that plaintiff "successfully carried out her job" for many

years). Encarnacion's job description was flexible enough to

permit the jury to determine that he possessed the necessary

qualifications, and that the stated reason for his dismissal was

pretextual.

5. Maria de Lourdes Escute-Levest


Ms. Escute-Levest was dismissed from her "regular"

position, as a Computer Operator I, in October 1985. Initially,

defendants contended that she was unqualified, but later

retreated to their "nullity of appointment" justification when

20

she protested that she had an associate degree in computer

programming. See supra note 5. Escute, a member of the former


mayor's "advance team," testified at trial without objection

as to the basis of her knowledge12 that her position was

refilled following her dismissal, suggesting that it was not as

expendable as defendants contend on appeal. The cumulative

circumstantial evidence of discriminatory animus and pretext was

sufficient to shift the burden of persuasion to defendants and to

support the jury verdict.

6. Jesus Garcia Delgado


Garcia was dismissed from his "regular" position, as a

Computer Operator I, in November 1985. Defendants contended that

Garcia, who possessed an associate degree in computer program-

ming, did not have the required year of experience in a "related

field" at the time he was appointed in 1978. Even so, he had

accumulated seven years' experience by the time he was dismissed,

and plainly met all qualifications for the position long before

his dismissal. As the jury could have inferred that the justifi-

cation offered for the dismissal was pretextual, there was enough

evidence to shift the burden of persuasion to defendants.



12At oral argument, defendants contended that plaintiffs'
trial testimony regarding their replacements was too conclusory
and lacked factual foundation. However, at trial the defense did
not object to plaintiffs' testimony based on lack of foundation.
Thus, the jury was entitled to resolve these issues on the basis
of its credibility determinations and weighing of the evidence.
As the evidence was not challenged at trial, and there has been
no showing of "plain error," Doty v. Sewall, 908 F.2d 1053, 1057

(1st Cir. 1990), we reject their claim on appeal.

21

7. Victor M. Guadalupe Bobonis


Guadalupe was dismissed for the second time from his

"transitory" position, as a municipal guard, in October 1985. In

January 1985, the occasion of the first dismissal, the only

justifications defendants offered were that his transitory

appointment had already lapsed and the position was deemed

expendable under the "austerity" program. Mayor Aponte abruptly

rescinded the first dismissal letter on January 25, 1985. In

June 1985, however, Aponte sent another letter of dismissal,

asserting that Guadalupe did not meet the minimum qualifications

for the position, and that his original appointment therefore had

been illegal. As there was no evidence that Guadalupe did not

meet the minimum job qualifications, the jury reasonably could

have concluded that defendants' shifting justifications for

Guadalupe's dismissal amounted to pretextual posturing.

Furthermore, Guadalupe testified that twelve or fifteen

more policemen were hired after his dismissal. See Nereida-


Gonzalez, 990 F.2d at 706 (noting that evidence suggesting that


defendants' reorganization was a "sham" may be considered proba-

tive of discriminatory animus); Ferrer, 914 F.2d at 311 ("over-


staffing" defense undermined by competent evidence from which

jury could conclude that defendants later hired replacements to

perform same functions entailed by plaintiff's position); see


also supra note 12.


8. Ada N. Perez Colon


22

Ms. Perez was dismissed from her "regular" position, as

an Executive Officer I, in September 1985. Defendants contended

that she was not qualified, and alleged that she had taken an un-

authorized medical leave, without pay, to undergo surgery. The

Executive Officer I position requires a four-year college degree

and administrative or supervisory experience, or an "equivalent

combination of academic background and experience." Perez, who

was a member of the former mayor's "advance team," had attended

college for two years, and had worked for the City since 1980 as


an officer for the CETA program and a coordinator at the Human

Resources Department. Thus, the jury reasonably could have

determined that her five-year City work experience was sufficient

to offset the two-year deficit in education. See supra note 7.


The jury therefore was free to conclude that both justifications

for her dismissal were pretextual.

9. Evelyn Quinones Osorio


Ms. Quinones was dismissed from her "regular" position,

as an Executive Secretary III, in September 1985. Within two

weeks after taking office, Mayor Aponte called all mayor's office

employees together and advised that they were "persons who were

in trust to the former mayor," and that they would be replaced or

transferred in "due time." Defendant Martinez also told Qui-

nones, a member of the former mayor's "advance team," that she

"didn't have his trust." After training her replacement, Qui-

nones accepted a transfer out of the mayor's office. She testi-

fied that officials of the new administration erased her time

23

cards and, on one occasion, retained her paycheck for six weeks.

Defendant Martinez, City personnel officer, told Quinones:

"[T]hose are injustices but I follow orders from above." (Empha-


sis added.) 

In July 1985, after Quinones' brief tenure in the new

secretarial position, Aponte notified her that she would be ter-

minated because she was unqualified for the position. The rele-

vant job description called for a two-year secretarial course,

and four years' secretarial experience, but two years of work

experience could be substituted for educational experience. When

Quinones provided satisfactory documentation of her educational

qualifications, defendants fell back on their "nullity of ap-

pointment" defense as the sole ground for her September 1985

dismissal. See supra note 5. Moreover, Osario testified that


she had worked as a secretary since 1980, and her final year as

an Executive Secretary III clearly qualified her for her new

position. Thus, Quinones presented sufficient direct and circum-

stantial evidence of discriminatory animus and pretext to shift

the burden of persuasion. 

10. Carmen Rivera Guadalupe


Ms. Rivera Guadalupe was dismissed from her "transito-

ry" positions, as Child Care worker and Secretary, in January

1986. She was notified that she was being terminated because her

transitory appointment had lapsed, and the City could no longer

afford to fund the position. Her husband continued to work for

the Aponte administration for another five or six years. Like

24

plaintiff Colon, Ms. Rivera offered no evidence that the elimina-

tion of her position was in any way pretextual, nor that she was

ever replaced, let alone by a PDP member. As political affilia-

tion and the timing of the dismissal were insufficient to satisfy

her threshold burden of production,13 the jury verdict must be

set aside as conjectural.

11. Luisa Rivera Serrano


Ms. Rivera Serrano was dismissed from her "transitory"

position, as a Clerk I, in August 1985, ostensibly because her

fixed term of employment had expired. Although the jury reason-

ably could have inferred that her position, like that of Ms.

Rivera Guadalupe, would be eliminated on austerity grounds, the

implicit rationale for her dismissal was undermined by Ms. Rivera

Serrano's testimony that she was replaced by Rosa Mattos, a PDP

member. Defendants' attempt to undermine Rivera's testimony, by

noting that she previously had identified a different person

(Inez) as her replacement, fails. Not only are we precluded from

credibility determinations, see Hendricks & Assocs., 923 F.2d at


214, but Rivera offered a plausible explanation for her inconsis-

tent responses: both individuals applied for her former posi-

tion. As there was ample basis for a reasonable inference that

the proffered ground for the dismissal was pretextual, the jury

verdict must be upheld.



13Like Ms. Colon, see supra text accompanying notes 9-11,

Ms. Rivera's NPP activities were peripheral and relatively incon-
spicuous. She served as a polling unit officer for the NPP, and
chaired the NPP Womens' Movement at her local union.

25

CONCLUSION


We acknowledge the careful attention the district court

has given the evidence in this case.14 In the Rule 50(b) con-

text, however, we are required to recognize that evidence does

not pass through the jury "lens" unrefracted. Our review con-

vinces us that these jury verdicts, with two exceptions, must



14In February 1992, the district court denied defendants'
first Rule 50(b) motion. After carefully reviewing its "notes,
defense arguments and the jury verdicts," the court based its
ruling on the fact that "the jury individually and meticulously
considered each [of the 255] claim[s]." The closeness of these
questions is demonstrated by the district court's equally pain-
staking reconsideration, as well as our own review.
We nevertheless reject plaintiffs' appeals from the district
court ruling denying their reinstatement. A denial of reinstate-
ment is reviewed for "abuse of discretion," Hiraldo-Cancel, 925

F.2d at 13, and we will reverse "only if we are left with a firm
conviction that [the district court] has committed 'a meaningful
error in judgment.'" Rosario-Torres, 889 F.2d 314, 323 (1st Cir.

1989) (en banc) (quoting Anderson v. Cryovac, Inc., 862 F.2d 910,

923 (1st Cir. 1988)). It did not. After assiduously weighing
the equities, the district court rejected the reinstatement
claims on several sustainable grounds. First, federally com-
pelled reinstatements to municipal positions implicate serious
comity and federalism concerns, especially in light of the
compelling evidence that plaintiffs' appointments were made in
blatant disregard of Commonwealth and municipal personnel and
electoral laws, and that the City was operating under severe
fiscal constraints, both at the time of the dismissals. Id.

(noting that, "[i]n shaping equitable remedies, comity concerns
can loom large," and that "court-ordered reinstatement of ille-
gally-hired . . . workers strikes a particularly jarring note").
Second, significant periods of time elapsed after their dismiss-
als before plaintiffs requested injunctive relief. Id. at 324.

Finally, some of the harshness inherent in a refusal to reinstate
is diminished where the employee has been awarded significant
monetary relief. See Rosario-Torres, 889 F.2d at 322, 324

(contrasting Title VII cases, which do not permit recovery of
compensatory or punitive damages, with First Amendment political
discrimination cases, which offer a fuller "palette of available
make-whole remedies" to offset a denial of reinstatement).

26

therefore be reinstated.15

Judgment in accordance with the verdicts must be rein-


stated for all appellants, with the exception of Maria Colon de


Jesus and Carmen Rivera Guadalupe. In all other respects, the


district court judgment is affirmed. The case is remanded to the


district court for further proceedings not inconsistent herewith.


Costs are awarded to the nine prevailing appellants.




15Aponte also asserts that the verdicts should be vacated as
inconsistent, since the special verdict did not label Aponte
"liable" for political discrimination and yet found him liable
for punitive damages. We reject this contention. A facially
inconsistent verdict in a civil action no rare phenomenon 
is not an automatic ground for vacating the verdict. See Fair-

mount Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 485 (1933).

The court "must attempt to reconcile the jury's findings, by
exegesis if necessary . . . before [it is] free to disregard
[them]." Gallick v. Baltimore & Ohio R. Co., 372 U.S. 108, 119

(1963).
Here, the findings are readily reconcilable. The jury
charge, to which there was no relevant objection, suggested that
Aponte's liability and the municipality's liability could go hand
in hand. Since the special verdict form did not specify the need
for dual findings on liability, the jury may have reasoned that
branding the City "liable" necessarily incorporated a finding of
Aponte's liability as well. Accordingly, in view of the jury's
clear imposition of liability for punitive damages on Aponte, we
cannot conclude that the verdict naming only the City "liable"
for discrimination unambiguously or completely exonerated
Aponte. Compare DeFeliciano v. DeJesus, 873 F.2d 447, 452 (1st

Cir.) (citing cases in which employee was completely exonerated,
but employer, whose liability could only derive from employee's
liability, was found liable), cert. denied, 493 U.S. 850 (1989).


27